THE KAW VALLEY DRAINAGE DISTRICT OF WYANDOTTE COUNTY, *Plaintiff*, v. THE KANSAS CITY SOUTHERN RAILWAY COMPANY, *Defendant*.

No. 18,064.

THE KAW VALLEY DRAINAGE DISTRICT OF WYANDOTTE COUNTY, *Plaintiff*, v. THE KANSAS CITY TERMINAL RAILWAY COMPANY, *Defendant*.

No. 18,065.

SYLLABUS BY THE COURT.

1. MANDAMUS—*Drainage District—Clearing Channel of River—Elevation of Railroad Bridges.* The Kaw Valley Drainage District, in its work of clearing the channel of the Kansas river at and near its mouth and in prescribing the height of bridges over such stream, is exercising the police power of the state, and has the right to require railroad companies to elevate their bridges to correspond with the height of levees constructed by the board, its determination that such elevation is necessary being *prima facie bona fide* and valid.

2. —— *Same.* It is no defense to an action to compel such elevation that such requirement would entail upon the railroad companies large expense or force them into controversies with the city and other railroad companies respecting the raising of grades made necessary by such elevation. Their rights and franchises must be deemed to be held subject to the necessity of complying with all reasonable requirements which the legislature may make or authorize in the exercise of the police power of the state.

3. CONSTITUTIONAL LAW. Such requirement does not by reason of the consequent expense and difficulty amount to a violation of the contract, commerce, due process, or equal protection clause of the federal constitution.

4. FORMER AGREEMENT—*Ultra Vires—No Defense.* The plaintiff board, having no power to abrogate its authority by contract, is not bound to refrain from requiring such elevation by reason of an agreement in 1907 to treat a certain bridge of lower elevation as lawful and sufficient; the party thus contracting with the board being required to know that such contract, if construed to prevent other and different requirements as conditions should demand them, was *ultra vires*.

5. PLANS—*Approved by Federal Authorities.* The plaintiff board can not compel the elevation of the bridges in question until reasonable plans therefor are approved by the proper federal authorities.

Original proceeding in mandamus. Opinion filed May 11, 1912. Peremptory writ allowed.

*John S. Dawson*, attorney-general, *L. W. Keplinger*, and *C. W. Trickett*, for the plaintiff.

*Samuel W. Moore, O. L. Miller, Samuel W. Sawyer*, and *Cyrus Crane*, for the defendants.

The opinion of the court was delivered by

West, J.: The Kaw Valley Drainage District prays for a writ of mandamus against the Kansas City Southern Railway Company, compelling it to raise its bridge across the Kansas river six and five-tenths feet, and to remove its old bridge, superstructure, abutments, piers, piling and wreckage. The plaintiff alleges that the federal government established harbor lines along the river, which lines coincide substantially with those established by the plaintiff for a levee; that by statute the plaintiff is given authority to determine the height of the superstructure of all bridges crossing the river within the drainage district and to compel the raising of bridges accordingly; that the defendant owns a bridge across the river within the district; that on or about July 15, 1911, it was notified by the plaintiff to raise its bridge six and five-tenths feet and to remove the old bridge, superstructure, abutments, piers, piling and wreckage, but that it has failed, neglected and refused so to do.

The defendant answers that it is a railway corporation, and citizen of Missouri, engaged in interstate commerce, its business being that of a switching company, moving cars received from other railroads, handling shipments of goods received from states other than Kansas, such railroads having no tracks connected with the industries to which such goods are assigned, and transferring cars loaded with such shipments from Kansas City, Mo., to other railways in Kansas and

18—87 Kan.

placing such cars for unloading at the various industries along the line of the defendant's road in Kansas, and taking such cars there loaded and transporting them to Kansas City, Mo.; that its tracks extend from the state of Missouri to and into Wyandotte county, and are laid across the bridge in question, the defendant having no other connection than its tracks across such bridge; that if such connection is destroyed or its use rendered unavailable, the line will be separated and its business as an interstate carrier destroyed, and the business of a large number of industries in Kansas greatly injured and in some cases destroyed; that if the bridge is raised as prayed for the defendant's business will be interrupted, its trains can not be transported across the river, and its line of road will be cut and all its interstate business effectually destroyed; that the present height of its tracks upon the bridge is such that any additional elevation will preclude the use of the bridge for trains except by the construction of another approach at either end several feet above the surface of the defendant's tracks; that such approaches extend across various public streets in Kansas City, Kan., not under the control of the defendant; that the defendant has no right, power or authority to raise its tracks upon such streets unless their grade is raised by order of the city; that a large amount of private property abutting upon such streets would be seriously and permanently damaged by the change of grade, and that the plaintiff has taken no steps to ascertain such damages or compensate the owners therefor; that the city refuses to change the grade; that the defendant's tracks on the east side of the bridge are intersected by the tracks of three other railroad companies, and if the bridge is raised as desired such tracks would be cut in two and rendered useless unless also raised by their owners, which such owners refuse to do, and that the plaintiff has made no arrangements to have the same done; that a compliance with the demand of the plaintiff would

cost more than $30,000, and the destruction of the bridge for railway purposes would injure the defendant many hundred thousands of dollars; that the enforcement of the plaintiff's demand would deprive the defendant of its property without due process of law and deny it the equal protection of the law, and operate as a direct interference with and a prohibition of interstate commerce, as the defendant carries over its lines interstate freight in carload lots, and that the defendant has made application to the chief of engineers and secretary of war for approval of plans for rebuilding its bridge, which application is pending, and that such change can not be made without the consent of such officers.    Except as specifically admitted, the answer denies all allegations of the alternative writ.

The plaintiff withdrew its reply and moved for judgment on the pleadings, and although in the brief there is a long detailed statement of alleged facts, we can only consider the case upon the allegations contained in the writ and in the answer and return.    There is no allegation in the alternative writ when the federal government established the harbor lines, or when and in what manner the defendant constructed the present bridge, and no direct allegation as to any old bridge, abutment, piers, piling or wreckage.    All we can ascertain from the face of the pleading is that at some time the federal government established harbor lines, which coincided substantially with the levee lines established by the plaintiff; that the defendant owns a bridge across the river, which it has refused to raise in accordance with the notice and request of the plaintiff.    The allegation in the answer that the plaintiff has no power or authority to require the bridge to be raised as demanded is possibly based upon the act of March 3, 1899, which provides (30 U. S. Stat. at Large, ch. 425, § 9, p. 1151) that it shall not be lawful to construct any bridge over any navigable water of the United States until the consent of congress shall have been obtained and until the

plans shall have been submitted to and approved by the chief engineer and secretary of war. The allegation of the answer that application for such approval has been made and is still pending is attempted to be met by the plaintiff's brief, which states that on June 24, 1910, the secretary of war ordered the defendant to do exactly what is now desired by the writ, but this allegation, not being contained in the pleadings, can not be considered.

The plaintiff also prays for a writ against the Kansas City Terminal Railway Company to require it to raise its bridge, the allegations being practically identical with those already considered. To this the Terminal company, after denying all allegations not expressly admitted, avers that it is a Missouri railway corporation engaged in interstate commerce; that its tracks extend from Jackson county, Missouri, into and through Wyandotte county, Kansas, and other allegations similar to those already made by the Southern company; further, that the demand of the plaintiff is unreasonable, illegal and arbitrary, and would require either a total destruction of the defendant's business or necessitate wrongful and illegal acts upon the public streets of Kansas City, Kan. The answer further alleges that under a contract made on May 28, 1907, with the plaintiff, it was mutually agreed, as a compromise and settlement of their differences then in litigation, that the Terminal company would proceed to construct a permanent bridge in accordance with plans shown by a blue print attached to the contract, the plaintiff agreeing to such construction and declaring that when completed it should constitute a lawful structure, not waiving any right to require the construction of an additional span from the west pier to any harbor line it had established or might thereafter establish; that pursuant to such contract the bridge was constructed, at an expense of many thousands of dollars, in exact accordance with such blue print, and that after such contracts the Terminal company became owner by purchase of all the

tracks heretofore belonging. to the Kansas City Belt. Railway Company and to the Belt Line bridge, and that no changes have occurred in the river since to warrant the demand sought by the plaintiff; that the plan for such bridge was submitted to and approved by the secretary of war, and that the plans for the bridge now demanded have not been submitted to or received the approval of the chief engineer or secretary of war as provided by the act of congress of March 3, 1899 (30 U. S. Stat. at Large, ch. 425, § 9 *et seq.*, p. 1151), and that any deviation from the former bridge without such submission and approval would be unlawful.

The plaintiff added an amendment to its alternative writ, and then asked for judgment on the pleadings. The amendment is that, since the construction of the bridge, and by virtue of a resolution of congress of February 16, 1909, the secretary of war, through the United States engineering department, fixed harbor lines and decreed that the defendant's bridge should be raised. That since the erection of the present bridge the plaintiff ascertained and determined, after the flood of 1908, the necessity of raising the bridge as demanded, and that upon order and request so to raise the same the defendant refused.

From the plaintiff's allegations concerning the bridge demanded we deduce that the war department and the plaintiff have ordered the defendant to raise its bridge to the height prayed for, and that it has submitted plans to the war department for approval, and that such approval has not been obtained or such application passed upon, but the allegation as to the decree of the secretary of war that the bridge be raised stands denied. To cover this gap the plaintiff produces certain blue prints or maps, bearing the name of the acting secretary of war, and purporting to have been prepared pursuant to public resolution No. 43 of congress, approved February 16, 1909, which authorized the secretary of war to "fix and establish pierhead and bulk-

head lines, either or both, in the Kansas River at Kansas City, Kansas, beyond which no piers, wharves, bulkheads, or other works shall be extended or deposits made, except under such regulations as shall be prescribed from time to time by the Secretary of War." (35 U. S. Stat. at L., part I, p. 1164.) These maps state on their faces that they are "to accompany report of this date (May 20, 1910) on public hearing Jan. 25-27, 1910, authorized by the Chief of Engineers, U. S. Army." We find in the annual report of the chief of engineers for 1910 (Engineering Department Annual Report, 1910, part 2, appendix AA, p. 1833) a report that a hearing was had in Kansas City, Mo., January 25, with an adjourned hearing to January 27, 1910, and a report submitted May 20, 1910, with map and description of the harbor lines, which lines were finally approved by the war department June 24, 1910. In none of these maps or documents do we find any order to raise the bridge; hence this allegation remains denied and unproved.

As to the contract it seems that by its terms an agreement was made in 1907 that the present bridge should be deemed lawful and sufficient, subject to the requirement of an additional span on the west bank of the river. The allegation of the plaintiff is that the flood of 1908 made it necessary to elevate the bridge as demanded, while the allegation of the defendant is that the requirement is arbitrary and capricious. As the plaintiff is a public corporation manifestly created for the purpose of preserving and protecting life and property from the ravages of floods it must be presumed that its officers are acting in good faith and with sufficient cause and reason and that *prima facie,* at least, their conclusion as to present requirements is correct. One of the powers of the board repeatedly expressed in the act (Gen. Stat. 1909, §§ 3006, 3009) is to do such things as shall be "conducive to the public health, convenience, or welfare," and it is known that

the statute was enacted by reason of the flood disasters in 1903 and 1904 with a view to avert their repetition if possible.   Among the powers vested in the board are:

"To prescribe, regulate and fix the height of the superstructures above the water, . . . to fix, regulate and change the grade or elevation of all public highways, railroads and street railroads at points where any levee may cross or intersect the same; . . . to require all railroad companies to elevate their tracks at all points where the same shall be intersected by any levee so that such tracks will not interfere with the construction or maintenance of such levee as a continuous and effective work of uniform height to prevent the overflow of any natural watercourse; . . . to do all other acts that may be necessary to carry out and execute the general powers hereinbefore or hereinafter granted, although not hereinbefore specially enumerated."

Being created for the purpose indicated it can not be held that one set of officers can bind themselves or their successors by an agreement like the one in question, for if such could be the case requirements for future conditions would be rendered futile, and conditions agreed upon by one board would have to remain in spite of the desires and conditions possessed and found by a subsequent board.   Any person or corporation contracting with the board must be held to do so subject to such changes in the matters contracted about' as subsequent exigencies may require.   In its work of clearing the channel of the river and fixing the height of superstructures the board is clearly exercising police power, and it is settled that in such cases a contract by which police power is attempted to be abrogated is *ultra vires* and void.   (*State ex rel. v. St. Paul, M. & M. Ry. Co.*, 98 Minn. 380, 108 N. W. 261.)

"The right to exercise the police power is a continuing one that can not be limited or contracted away by the State or its municipality, nor can it be destroyed by compromise as it is immaterial upon what consideration the attempted contract is based."   (*Northern Pacific Railway v. Duluth*, 208 U. S. 583, syl.)

In that case it was said in the opinion:

"There can be no question as to the attitude of this. court upon this question, as it has been uniformly held that the right to exercise the police power is a continuing one; that it can not be contracted away, and that a requirement that a company or individual comply with reasonable police regulations without compensation is the legitimate exercise of the power and not in violation of the constitutional inhibition against the impairment of the obligation of contracts." (p. 596.)

On the same page is found a quotation from the decision in *N. Y. & N. E. Railroad Co. v. Bristol,* 151 U. S. 556:

"It is likewise thoroughly established in this court that the inhibitions of the Constitution of the United States upon the impairment of the obligation of contracts, or the deprivation of property without due process, or of the equal protection of the laws, by the States, are not violated by the legitimate exercise of legislative power in securing the public safety, health and morals. The governmental power of self-protection can not be contracted away, nor can the exercise of rights granted, nor the use of property, be withdrawn from the implied liability to governmental regulations in particulars essential to the preservation of the community from injury." (p. 567.)

It is argued that because this section authorizes the board to "condemn and cause obstructions in such watercourses to be removed" (Gen. Stat. 1909, § 3006, subdiv. 4), it can not obtain the relief now prayed for without condemnation and compensation. But the evident meaning of "condemn" as here used is to declare or pronounce a thing to be wrongful, and not to proceed as under the rule of eminent domain to have it appraised.

"Condemn: To pronounce to be wrong; to disapprove of; to censure." (Webster's New Int. Dic. 1911.)

The succeeding clause expressly empowers the board to acquire by "gift, purchase or condemnation" such lands as may be necessary, and it would indeed be an

anomaly to speak of condemning an obstruction for the purpose of acquiring title to it.

In answer to the claim of the defendant that it is unlawful for it to change its bridge without approval by the secretary of war under the act of March 3, 1899, the plaintiff cites *Cummings v. Chicago*, 188 U. S. 410, which held that the act of 1899 did not manifest any purpose on the part of congress to assert power to authorize private persons to erect structures within a navigable water of the United States wholly within the limits of a state, without regard to the wishes of the state, and that such right depends upon the concurrent or joint assent of the state and national governments. The close of the opinion is as follows:

"The secretary of war acting under the authority conferred by Congress may assent to the erection by private parties of such a structure. Without such assent the structure can not be erected by them. But under existing legislation they must, before proceeding under such an authority, obtain also the assent of the State acting by its constituted agencies." (p. 431.)

There is nothing in this decision indicating that a bridge across such waters can be lawfully erected or reconstructed until the plans therefor are approved as required by the act of 1899. It is familiar doctrine that when congress has legislated upon a subject within its powers such legislation is binding upon the states, and for us to hold now that the defendant can be compelled by mandamus to raise its bridge as demanded without obtaining the approval of the plans therefor as required by congress would be to disregard rather than to obey such legislation.

There remain questions concerning the power or propriety of granting the writs prayed for in view of the conditions set forth by the defendant as to the raising of grade to provide proper approaches for the bridges when so raised. We are met squarely by the question whether we can or should compel the defendants to put their bridges up to an altitude, which, with-

out the raising of approaches, would render them absolutely useless and destroy the business and interstate possibilities of the defendant companies, and whether they should be required to do this upon the theory that it rests upon them to find some way to compel or induce the city and the owners of intersecting railway tracks to permit such raising of the bridges and take care of the consequent alleged damages to abutting property.

It is insisted that the only proper method of requirement, if any, would be a proceeding in equity to which the city and others interested should be made parties, and that mandamus is not available, and *The State v. Mo. Pac. Rly. Co.*, 33 Kan. 176, 5 Pac. 772, and *Burlington & Colo. R. Co. v. People,* 20 Colo. App. 181, 77 Pac. 1026, are cited to sustain this contention. The first decision was upon the grounds, mainly, that the ordinance requiring the viaduct was vague and indefinite and that its enforcement would contravene certain provisions of the statute. In the Burlington case the ordinance was specific, but it was deemed that a bill in equity rather than an action in mandamus was proper for the reason that the viaducts sought to be required were such that no one of the companies involved could, independently of the others, build the portion required of it. It was a case in which it was attempted to require various defendants by one order to do what would amount to works of duplication, and one in which coöperation could not be compelled. Here the two defendants only are proceeded against, each separately, and as between the plaintiff and either of them there is no physical obstacle to performing the thing required. That its performance may entail loss or expense to the defendants is a misfortune which, under the authorities, is no sufficient reason for refusing the writs. In cases where public disaster is sought to be averted the exercise of the police power is often burdensome indeed to the parties moved against, and a

case might be imagined in which the actual destruction of valuable property would be required.   As said in *Balch v. Glenn*, 85 Kan. 735, 119 Pac. 67:

"Property taken or destroyed for the purpose of abating a nuisance or to prevent the spreading of a pestilence is not taken for public use.  All private property is held subject to such reasonable restraints and burdens as in the opinion of the legislature will secure and maintain the general welfare and prosperity of the state. . . .  Cases sometimes arise where the exigencies of the situation require private property to be destroyed immediately in order to prevent the spread of pestilence or some other calamity, and where, under all the circumstances, the loss which the individual suffers is so inconsiderable in comparison with the benefits to the public that in the opinion of the legislature he is regarded as fully compensated by his individual share in the benefit accruing to the public." (pp. 740, 743.)

But in this case the parties are corporations formed for a quasi public purpose and when granted rights to build their tracks across streams they take such rights subject to the liability of having to make such changes as the public welfare may require, especially so in cases where the occurrence or spread of great public disaster is sought to be averted.

"All property, whether owned by private persons or by corporations, is held subject to the power of the State to regulate its use in such manner as not to unnecessarily endanger the lives and the personal safety of the people.  The requirement that compensation be made for private property taken for public use imposes no restriction upon the inherent power of the State by reasonable regulations to protect the lives and secure the safety of the people. ·

"The expenses that will be incurred by the railroad company in erecting gates, planking the crossing and maintaining flagmen  . . .  necessarily result from the maintenance of a public highway, under legislative sanction, and must be deemed to have been taken by the company into account when it accepted the privileges and franchises granted by the State.  Such ex-

penses must be regarded as incidental to the exercise of the police powers of the State, and must be borne by the company." (*Chicago, Burlington & C. R'd v. Chicago*, 166 U. S. 226, syl.)

"Uncompensated obedience to a regulation enacted for public safety under the police power of the State is not taking property without due compensation. . . . It is the duty of the railway company, at its own expense, to remove the present bridge, and also (unless it abandons or surrenders its right to cross the creek at or in that vicinity) to erect at its own expense and maintain a new bridge in conformity with the regulations established by the Drainage Commissioners, under the authority of the State; and such a requirement, if enforced, will not amount to a taking of private property for public use within the meaning of the constitution, nor to a denial of the equal protection of the laws." (*C. B. & Q. Railway v. Drainage Comm'rs*, 200 U. S. 561, syl.)

In the case just cited the court quoted with approval an expression of the supreme court of Illinois that the implied authority of the company to build its present bridge was coupled with the common-law duty " 'to build its bridge over the natural water-course, with a view of the future as well as the present contingencies and requirements of such water-course, and with the further implied provision that there remained in the State, whenever the public welfare required it, the right to regulate its use. (*C., B. & Q. Ry. Co. v. The People*, 212 Ill. 103, 118, 72 N. E. 219.)' " (p. 587.)

In *Northern Pacific Railway v. Duluth*, 208 U. S. 583, it was held that an ordinance of a municipality compelling a railroad company to repair a viaduct constructed after the opening of the road, by the city in pursuance of a contract relieving the railroad from making any repairs thereon for a term of years, was not void under the contract or due process clause of the constitution, and that such repairs could be required by mandamus. The court said:

"We can not resist the conclusion that, so far as con-

cerns the matter now under consideration, the charter
of the relator was taken subject to the right of the
State to impose this duty whenever, by reason of the
establishing of new highways, it should become nec-
essary; and hence the relator is not entitled to compen-
sation for obedience to this requirement. . . . But
the exercise of the police power can not be limited by
contract for reasons of public policy, nor can it be
destroyed by compromise, and it is immaterial upon
what consideration the contracts rest, as it is beyond
the authority of the State or the municipality to abro-
gate this power so necessary to the public safety.".
(pp. 595, 598.)

The court of appeals of the eighth circuit in *Chicago,
B & Q. R. Co. v. Board of Sup'rs,* 182 Fed. 291, held:

"A railroad corporation takes its franchise authoriz-
ing it to construct and maintain its road subject to the
duty of making such modifications in its roadbeds,
whether the same consists of trestle or grade, as may be
necessary to carry the same across such public improve-
ments as highways and public drains thereafter estab-
lished." (Syl. ¶ 3.)

Without multiplying citations it suffices to say that
the mere matter of expense is no defense. As to the
suggestion that the issuance of the writs would force
the defendants into controversies with the city and with
other railroad companies, it may be observed that were
the defendants seeking the privilege of raising their
bridges they would doubtless find a way to secure the
assent of the other interested parties, and it must be
left to them to take care of whatever contingencies may
arise by obedience to the requirements of the writs.
Such other interested parties can not well put them-
selves in the attitude of unreasonable hostility to the or-
ders of this court or to the welfare of the people com-
posing the drainage district, and it can not be presumed
they will do so.

While the plaintiff prays for orders directing the de-
fendants to raise their bridges to the points designated
in the alternative writs and remove the old bridges,

superstructures, abutments, piers, piling and wreckage, the real object is to clear the channel up to the height mentioned from obstructions—the subsequent elevation or rebuilding of the bridges in question being matters in which the defendants, rather than the plaintiff, are vitally interested.

While it is to be presumed that the bridges will, in fact, be elevated or rebuilt, it is not deemed necessary that we make an order to that effect, but the writs will be allowed in both cases requiring the defendants forthwith to remove from the channel of the Kansas river all obstructions of every kind where their lines cross such stream, the Kansas City Terminal Railway Company to clear such channel to a height of 342.73 feet above the St. Louis directrix, and the Kansas City Southern Railway Company to clear such channel to a height of 340.26 feet above the St. Louis directrix.