No. 19,115.

THE KAW VALLEY DRAINAGE DISTRICT OF WYANDOTTE COUNTY, *Plaintiff*, v. THE MISSOURI PACIFIC RAILWAY COMPANY et al., *Defendants.*

SYLLABUS BY THE COURT.

1. KANSAS RIVER—*A Navigable Stream.* The Kansas river is and always has been a navigable stream in contemplation of federal law.

2. SAME. Prior to the enactment of chapter 97 of the Laws of 1864 the Kansas river was a navigable stream in contemplation of Kansas law (*Wood v. Fowler*, 26 Kan. 682, 688), and the repeal of the act of 1864, by chapter 259 of the Laws of 1913, restored its legal status as to navigability, subject to all rights which have arisen under valid acts or grants by this state or by the federal government prior to the enactment of chapter 259 of the Laws of 1913.

3. SAME—*Statute Declaring Kansas River Nonnavigable for Certain Purposes Constitutional.* The act of 1864 (ch. 97) is not void under the constitutional inhibition (art. 2, § 16) that no law shall contain more than one subject. The provision of the act declaring the Kansas river's nonnavigability is correlated and germane to the chief purpose of the act, which was a grant of power to railroads to bridge the principal streams of the state.

4. RAILROAD CORPORATION—*Power to Bridge Navigable and Nonnavigable Streams—Interference with Flow of Stream.* Except as governed by chapter 215 of the Laws of 1905 and supplemental legislation, a grant of power to a corporation to construct and operate a railroad in Kansas carries with it the right to bridge all rivers along its right of way; but, whether such rivers are navigable or nonnavigable, they must be bridged so as not unduly to interfere with the flow of the stream, nor

to create or aggravate the danger of floods and peril to life and property through the obstruction of bridge piers and embankments in the channel.

5. JURISDICTION OVER KANSAS RIVER—*Vested in Drainage District—Statute Constitutional.* The exclusive jurisdiction over the Kansas river in and near Kansas City, vested in The Kaw Valley Drainage District by chapter 215 of the Laws of 1905, is not to be construed as an unconstitutional binding of administrative and judicial powers in one tribunal. All the reasonable orders of the drainage district board designed to aid in protecting the city and district will be enforced by judicial aid, but the reasonableness of the orders of the board is a proper question for judicial review.

6. SAME—*Drainage District—An Administrative Agency—Orders Must be Reasonable.* When the state creates an agency to serve its public needs and confers administrative powers upon it, a just and reasonable exercise of such powers is intended, and the power to make unreasonable, arbitrary and confiscatory orders is not intended. (Kansas Bill of Rights; U. S. Const., 14th Amendment.)

7. DRAINAGE DISTRICT—*Created for Protection Against Floods—Powers of District.* The state may create an agency to protect a city or district against floods which jeopardize life and property; it may clothe such agency with power to maintain actions to enforce all its rules, regulations and orders reasonably designed to accomplish the purposes of its creation; and The Kaw Valley Drainage District thus created may maintain mandamus proceedings to enforce its reasonable orders to secure its territory against floods.

8. PROTECTION FROM FLOODS—*Police Power of State.* The security of the lives and homes of the people is more important than interstate commerce, and the latter must yield to the former under the reserved police power of the state.

9. INTERSTATE RAILROAD BRIDGE—*Imperiling Lives and Property—May be Demolished.* A bridge which is an integral part of an interstate railroad highway may be demolished and removed from a stream if it constitutes such an obstruction as to cause the river to overflow and imperil the lives and inundate the homes of the people residing nearby.

10. INTERSTATE RAILROAD BRIDGE — *Concurrent Power to Regulate in Congress and State Legislature.* The general and exclusive control of interstate commerce vested in congress is specifically modified by congress itself (Act of March 3, 1899, 30 U. S. Stat. at Large, p. 1151, ch. 425, §§ 9, 10) in the matter of bridges over navigable streams located in a single state, and concurrent power over such bridges is vested in the state.

11. KANSAS RIVER—*Exclusively a Kansas Stream.* All the navigable portions of the Kansas river are located exclusively in Kansas.

12. RAILROAD BRIDGE — *Mandamus Proceedings to Remove Pending — Jurisdiction of State Courts Not Ousted by Foreclosure Proceedings*

*in Federal Court.* When a proceeding in mandamus is pending in a state court to compel the removal of a railroad bridge which tends to obstruct the flow of a river, and to flood the neighborhood and imperil the lives and homes of the people, a later proceeding in a federal court to foreclose a mortgage on the railroad property does not operate to abate the action in the state court nor to oust the jurisdiction of the latter.

13. SAME—*Appointment of Receiver by Federal Court—Did Not Abate Pending Mandamus Proceedings in State Court.* The appointment of a receiver to manage and operate a railroad as an instrumentality of interstate commerce does not operate to abate a prior pending action in a state court to require the removal of a bridge which is an integral part of, such railroad, where it is alleged that the bridge is a public nuisance which imperils the lives and homes of the people residing near it.

14. SAME—*Receiver Made Party to Mandamus Proceedings.* Such receiver may be made a party defendant, and, subject to the provisions of the federal judicial code (§ 66), he is bound by the judgment which may be rendered in the state court.

15. DRAINAGE DISTRICT—*Order of Board—Not Void—Preëlection Promises.* An order of an administrative board requiring the destruction of a bridge as a continuing menace to life and property through its tendency to obstruct the flow of a river and to cause it to overflow—the bridge having five piers in the channel—is not necessarily void because the members of the board, in their campaign for the suffrages of the people affected by the bridge's capacity for mischief, committed themselves to the proposition that, if elected, they would not tolerate any bridge having more than two piers.

16. DRAINAGE DISTRICT BOARD—*Hearings Before Not Governed by Rules of Court Procedure.* A hearing precedent to official action by an administrative board is not governed by the rules of procedure followed in courts of law. Informal hearings, consultations and conferences may fill the requisite requirements, and the true test of its sufficiency is the reasonableness of the official action which is taken pursuant to such hearing.

17. RAILROAD BRIDGE—*Erected Without Sanction of War Department—A Public Nuisance—May be Abated.* Where the federal government and the state have concurrent jurisdiction of the bridging of a stream, as in cases where the navigable portions of it are located exclusively within one state, a bridge erected without the sanction of the war department and without regard to public and private rights under state law is a public nuisance, and although the bridge is an integral part of an interstate railroad highway, it may be abated and removed if the welfare of the public can not otherwise be safeguarded.

18. LAW AND FACTS DETERMINED—*Final Judgment Postponed—Jurisdiction Retained.* Controverted questions of law and fact determined; the evidence summarized and held sufficient to show that defendant's

bridge as now maintained is a continuing menace to life and property and a public nuisance. Question of the necessity for the total destruction of the bridge undecided, to await conference of the parties; and jurisdiction of the cause retained.

Original proceeding in mandamus.  Opinion filed December 9, 1916.  Questions of fact and law determined; final judgment withheld; jurisdiction retained.

*R. J. Higgins, H. E. Dean,* and *T. A. Pollock,* all of Kansas City, for the plaintiff.

*A. L. Berger,* of Kansas City, *George L. DeLacy,* and *W. P. Waggener,* both of Atchison, for the defendants.

The opinion of the court was delivered by

DAWSON, J.: This is an application for a writ of mandamus to compel obedience to an order of The Kaw Valley Drainage District requiring The Missouri Pacific Railway Company to remove one of its bridges across the Kansas river because its low elevation, many piers, its southern abutment, riprap and filling obstruct the channel and free flow of flood waters to such an extent as to menace the lives and property of the people residing or doing business in the bottoms of Kansas City, Kan.

Before going into the details of this controversy, a general statement of the situation which gives rise to this lawsuit seems pertinent.

In the early summer of 1903 a great flood devastated the entire valley of the Kansas river from the interior of the state down to its confluence with the Missouri near the eastern state line.  Many lives were lost, and twenty thousand people in and near Kansas City, Kan., were rendered homeless.  Many millions of dollars' worth of public and private property was destroyed, including some seventeen railroad and public bridges in Kansas City.  Destructive floods in the Kaw valley have not been uncommon, although those carrying such enormous volumes of water as that of 1903 have only occurred previously within recorded annals in 1785 and 1844, at which times the only sufferers were the primitive Indians and the missionaries residing among them.  (Vol. 8, Kansas Historical Collections, 1903-1904, p. 472 *et seq.*)  In 1826, 1845, 1851, 1881, 1886,

1904, 1908 and 1915 the Kaw valley has been flooded, usually by the "June rise"; and as settlement has developed and property and business have become more congested the recurring frequency of these floods has become a matter of increasing and imperative concern to the commonwealth. With the usual negligence which is characteristic of free governments, the channel of the Kansas river had been permitted to be encroached upon by enterprising riparian owners, railroads and business men, until the stream bed had become far too narrow to furnish a waterway for floods of much less volume than that of 1903. On these encroachments in the natural channel properties of great value had been erected; and while it is technically true that doctrines of prescription and statutes of limitations do not run against the state (*Nullum tempus occurrit reipublicæ*), yet it has only been after much litigation and expense that the state has recovered and brought under its practical control this important waterway. To bring that about, and to create a responsible public agency charged with the duty to clear the channel of the Kaw, and to maintain a clear channel therein, and to construct and maintain dikes as a protection against floods, the legislature of 1905 (Laws 1905, ch. 215, Gen. Stat. 1909, § 3000 *et seq.*) created The Kaw Valley Drainage District, vesting it with all necessary powers for the effective exercise of its arduous and important responsibilities.

Prompted by similar motives the federal government has lent its aid. Army engineers detailed for that purpose made elaborate reports showing careful study of the local conditions, the extent of the encroachments made by riparian owners, the obstructions to the flow of the river by the wilderness of bridge piers which had studded its channel, the debris of wrecked bridges which encumbered it, and suggested that the channel be cleared and widened to a minimum of 734 feet for the first 17,000 feet above the mouth of the river. The war department established harbor lines accordingly, and The Kaw Valley Drainage District adopted the recommendations of the federal engineers and the harbor lines of the war department as the basis of its program for flood protection. The cost of clearing and widening the channel sufficiently to carry the waters of such a flood as that of 1903 would be altogether prohibitive, unless, indeed, the enormously valuable properties erected in

the natural channel should be treated altogether as illegal encroachments and condemned and confiscated as such. It was determined, however, as necessary, to protect the people and their property in the lower levels of the city from damage by even the ordinary floods which so frequently afflict that locality, that the extreme minimum channel width should be 734 feet, and that the river should be diked on that basis. To give the state's agent, The Kaw Valley Drainage District, full dominion and free access to the river to construct these dikes and to pursue this work of flood protection and river improvement, the governor, pursuant to legislative authority (Laws 1911, ch. 168) and after provision for reimbursement of all concerned was made, appropriated a strip of land forty feet wide parallel and adjacent to. the harbor lines. With funds raised by taxation dikes were erected on both sides of the river to a height of thirty feet above low-water mark, and most of this work has been completed from the river mouth to a point some miles west of the city. The river channel has been cleared, the bridges and remains of bridges destroyed by the flood of 1903 have been removed, encroachments within the dikes and harbor lines have mostly been abated, and the work has been so far successful that the flood of 1915 was controlled within the dikes and rendered comparatively harmless.

To accomplish all this has not only taken much labor and expense, but litigation as well. The government engineers had advised that bridges having more than two piers in the river would increase the flood hazard and unduly obstruct the adopted minimum width of the channel. As practically all the bridges about Kansas City had been destroyed by the great flood of 1903, it was possible and practicable to prescribe that no new bridges having more than two piers in the channel should be erected, and that the elevation and clearance should harmonize with the height of the drainage district's embankments. The one lone railroad bridge which survived the flood of 1903 was an exceptionally durable and expensive one built by the Missouri Pacific railway shortly prior thereto. Immediately after the flood, another and similar bridge was speedily erected by the Union Pacific railway close to the Missouri Pacific bridge. Both of these have three piers in the river, but the harbor lines and dikes were there widened to

742 feet to make allowance for the extra piers. These bridges were constructed without authority from the war department and before the state's plans for the protection of the city from floods had been perfected. The federal department of justice filed suits in the federal court against these railroads on the ground that they were built without the sanction of the war department, but probably because of the great cost of these structures and the hardship which it would impose on the railroads to remove them and because the channel and harbor lines had been specially widened thereat to make allowance for the extra piers, the federal court, with the consent of the war department, entered a decree ordering these bridges raised and otherwise reconstructed but permitting their three pier supports to remain in the channel. All the other new public and railroad bridges, except the one which is the subject of this lawsuit, have been erected with only two piers and elevation conforming to the regulations of The Kaw Valley Drainage District. One of the railroads, the Kansas City Southern, was at first disposed to resist the orders of the drainage district in this respect, and it was directed by this court to reconstruct its bridge to conform to the suggestions of the drainage board. (*Drainage District v. Railway Co.*, 87 Kan. 272, 123 Pac. 991.) The railway company appealed to the supreme court of the United States, where the judgment of this court was reversed, the court of last resort declaring that the destruction of a bridge on an interstate railroad could not be ordered merely to "help the drainage of a district." (*Kansas Southern Ry. v. Kaw Valley Dist.*, 233 U. S. 75.) So obvious was it, however, that the public's interest in the matter had not been sufficiently presented to the supreme court and that the court had been led to believe that the controversy was a mere balancing of rights and conveniences between improving "the drainage of a district" and the destruction of an interstate railroad bridge, that generously waiving its judicial victory, the Kansas City Southern acquiesced in the plans of the drainage district and is at this time reconstructing its bridge in full conformity to the drainage district's general program for the protection of the city and district against floods.

The resolution and order of The Kaw Valley Drainage Dis-

trict, to compel obedience to which the original jurisdiction of this court is invoked, recites in part:

"The bridge of the Missouri Pacific Railway Company, across the Kansas River, it being the first bridge above the mouth of said river, in the city of Kansas City, Kansas, in The Kaw Valley Drainage District of Wyandotte County, Kansas, generally known as the 'Chicago Great Western Railway Bridge,' sometimes called The Kansas City, Northwestern Railroad Bridge, is now and hereby found and declared to be constructed and maintained within the harbor lines and channel of said river, so as to cause and contribute to cause the overflow of said river. Said bridge is found and declared to be constructed in an unsafe, dangerous, and improper manner in the following respects, and by reason thereof to contribute directly to cause the overflow of the Kansas River at all times of floods and high water therein.

"Said bridge is composed of three main spans of the aggregate length of 610 feet, and has a through girder span at each end eighty feet in length. The main spans are supported by four concrete piers. The landward ends of the girders rest upon tubular iron piers, the east one 115 feet distance from and within the east harbor line (measured parallel with bridge). The main spans of said bridge should be 734 feet between faces of abutments, measured at right angles to the harbor lines. There should be no girder spans, and the ends of the bridge should rest upon abutments constructed adjoining and outside of the harbor lines. The pier at the west end of the bridge is 78.7 feet from the west harbor line. The pier at the east end of the bridge is 239 feet from the east harbor line. Said bridge should have but two piers inside the harbor lines. It now has five wholly within the harbor lines. The piers of said bridge should be constructed with the longest dimension thereof parallel to the current. The present piers are constructed at an angle of 30 degrees and 18 minutes to the current [37 degrees]. The four concrete piers of said bridge as constructed and maintained in effect reduce the lineal width of the river at said bridge 112 feet. The lineal width of the river at said place should not be reduced by piers more than 20 feet.

"The superstructure of said bridge is 337.73 feet elevation St. Louis Directrix. The lowest point of the superstructure should not be at an elevation of less than 339.42 feet St. Louis Directrix. The superstructure of said bridge is now 1.69 feet below the height and established elevation of the levees at said bridge.

"All the piers of said bridge within the harbor lines should go to bed rock. The present piers should be removed to a depth of 15 feet below low water, to elevation 294.42 feet. The piers of said bridge should be approximately 217 feet from the abutments, and the center span 300 feet in length, all measured at right angles to the harbor lines. The piers should go to bed rock, or at least 25 feet below low water.

"Said bridge by reason of its length, the number, location, manner of construction and maintenance of its piers, and the elevation of its superstructure, is now and hereby found and declared to unnecessarily, ma-

terially and wrongfully obstruct the flow of the water in the Kansas River during high water and floods in said river.

"It is further found and declared that said bridge as constructed and maintained, by reason of the matters aforesaid, does and will in the future materially and proximately contribute to cause and cause overflows of the Kansas River throughout the Kaw Valley Drainage District, and that said bridge as now constructed and maintained is a dangerous and wrongful obstruction and nuisance in said water-course.

"It is now and hereby found and declared necessary to the protection of the public health, life and property from the overflows of the Kansas River, that the said bridge, the superstructure, abutments and piers, thereof, the piling and riprap supporting and about the piers of said bridge and its abutments, (to a depth of 15 feet below low-water elevation to 294.42 feet) be removed from within the harbor lines and the channel of the Kansas River, and said bridge and all its said parts and each of them are now and hereby and for the reasons aforesaid condemned and ordered removed therefrom."

The answer of the principal defendant, The Missouri Pacific Railway Company, in part, alleges:

"That said bridge was constructed many years ago, if not with the actual approval of the Secretary of War, under authority of the laws of the state of Kansas under which said Kansas City Northwestern Railroad Company and its predecessor were incorporated, and without objection of the Secretary of War, or the authorities of the Government of the United States, has been maintained and operated in its present condition; that during all said years said Secretary of War and the United States Government have acquiesced therein, and taken no steps, directly or indirectly, to require this defendant to remove the same. . . .

"Seventh. This defendant further says that there is no necessity for said action on the part of said plaintiff, and the compliance with the commands of said alternative writ would be productive of no good or benefit to the public, or any person or persons or corporations under the jurisdiction or control of said plaintiff herein; that said proceeding to require the removal of said bridge is wholly arbitrary, unnecessary and without reason, and, if the commands of said alternative writ are complied with, it will interfere with and destroy the facilities operated and used by this defendant in the discharge of its duty to the public and in the transportation of United States mails and interstate commerce. . . .

"Ninth. This defendant further says that the order made by said plaintiff, in its corporate capacity as the Kaw Valley Drainage District, was made without any authority of law, and was an *ex parte* order, and this defendant, under the law creating the said Kaw Valley Drainage District, was [not] entitled to and had no notice that said order was about to be made, and had no hearing relative to the reasonableness of the same, but it was made arbitrarily and without notice, and deprived this defendant of the equal protection of the law; that the enforcement of the

Drainage District v. Railway Co.

said order would cause this answering defendant great. and irreparable damage, without due process of law."

The answer recites the history of the federal government's suits against The Missouri Pacific Railway Company and The Union Pacific Railroad Company in 1905 concerning their main-line bridges located about a mile upstream; and narrates the disposition, by consent, of certain litigation then pending between the defendant and other railroads and The Kaw Valley Drainage District; and continues:

"Twelfth. This answering defendant further says that the said The Missouri Pacific Railway Company and the Union Pacific Railroad Company were granted permission by said plaintiff herein, to each, to construct a bridge across said Kansas River at a point located approximately one mile upstream from the bridge involved in this controversy, and that said bridges so authorized by said Kaw Valley Drainage District to be constructed were built at right angles to the harbor lines as established by the United States Government and the Kaw Valley Drainage District and as constructed under said authority, were capable of passing a certain quantity of water under the same.

. "That this answering defendant's bridge, as now constructed across said Kansas River, is at an angle of approximately 36 to 37 degrees with the axis of the channel, but the superstructure of said bridge is one and $\frac{7}{10}$ (1.7) feet below the top of the dike as constructed on the right bank of said river; and this answering defendant further says that it has at all times been ready and willing and is now ready and willing to re-construct said bridge which is sought to be removed by the alternative writ of mandamus herein, in accordance with plans submitted to the plaintiff herein on or about the 29th day of September, 1913, and that if said bridge is re-constructed as proposed by said plans, a copy of which is hereto attached and made a part hereof, that greater quantities of water than can possibly flow through the Union Pacific bridge, which consists of three piers, the Missouri Pacific bridge, which consists of three piers—both of which bridges are located approximately one mile above said bridge in controversy—the James Street Bridge and the Intercity Viaduct—both of which bridges consist of two piers each and located a thousand to fifteen hundred feet upstream from the present bridge—will readily pass under said answering defendant's bridge as proposed to be re-constructed.

"That in the re-construction of said bridge, this answering defendant is now, and has at all times been ready and willing to re-construct the same in accordance with the plans hereto attached and made a part of this amended and substituted answer. On said plans hereto attached is shown in green the portion of the present bridge that it is proposed be permitted to remain; in red, the portion of the present bridge that it is proposed to remove, and in yellow, the new portion to be constructed to provide enlarged waterway, the raising and reconstruction to consist of the following.

"1. The entire bridge to be raised 1.7 feet to make the lowest point of the steel work as high as the top of levee and the approaches to be raised to meet the new elevation of the bridge..

"2. That portion of the present east approach between the east concrete pier and the east harbor line on the right bank of the Kaw River, consisting of a through girder span, cylinder piers, trestle approach and some rip-rap surrounding east concrete pier to be removed and the footing of the pier to be protected if necessary by steel sheeting, and all the piers of the bridge to be thereafter kept in such condition that it will not be necessary to deposit any rip-rap around them.

"3. New concrete abutment to be constructed at the east end of the approach landward of the right harbor line of the Kansas River.

"4. New steel span approximately 250 feet in length to be constructed as a clear span from the east concrete pier to the new abutment that will be constructed on the right bank of the River landward of the harbor line.

"Answering defendant further says that the Board of Directors of the said plaintiff herein arbitrarily and unreasonably and unnecessarily refuses to permit this defendant to proceed with the re-construction of said bridge on such plans and specifications, but insist in lieu thereof that the said bridge as now existing shall be removed, and that a bridge be constructed in its place having but two piers, all of which is unreasonable and unnecessary and will compel this defendant to pay out a large and unreasonable sum of money, when the construction of a two pier bridge will not be of any benefit whatever to the people of said Kaw Valley Drainage District."

This action was commenced on May 3, 1913, and the taking of evidence and the collection of evidenciary documents, charts, and more or less pertinent data, began sometime afterwards. The record is interminably long and embraces many matters of minor significance. There is an unusual amount of conflict in the testimony, especially as to the relative volume of water which can pass under this bridge compared with the Missouri Pacific and Union Pacific main-line bridges and other bridges upstream. Many formulas using hypothetical coefficients to estimate the roughness of the river bed, and to approximate the probable scouring of the channel by flood waters, etc., were mathematically worked out by civil engineers and submitted.

So voluminous is the record, and so many and varied are the matters of fact and of law which are urged upon our attention, that with due regard to the compass of our opinion and the limits of time to prepare it, we will be compelled, on many phases of the controversy, simply to state our conclusions.

After much of this exhaustive and expensive evidence had been gathered, on August 19, 1915, some two years and three months after this action was commenced the Missouri Pacific railway was subjected to a foreclosure proceeding in the federal court in Missouri, and a receiver was appointed for all of the properties of the defendant in Missouri, Kansas, Nebraska and elsewhere, including, of course, the bridge involved in this case. On application of the plaintiff the receiver was made a party to this action; his plea in abatement was overruled; and, saving his exception, he answered, setting up the foreclosure proceedings in the federal court and his appointment thereunder, his possession and administration of the defendant's property under the orders of the federal court, and alleging that the bridge was an integral part of the property and devoted to interstate commerce and valued at $300,-000, and—

"That said Federal Court so appointing Benjamin F. Bush Receiver as aforesaid has and had full and complete jurisdiction, not only of the parties to such action in which said Receiver was appointed, but of the subject matter of the same, . . . and this Court has no power, jurisdiction or authority, by mandamus or otherwise, to require said Receiver, so acting under the direction and orders of said Federal Court, and as an officer of said Court, to remove said bridge, or any part thereof; . . .

"This answering defendant, Benjamin F. Bush, Receiver, here adopts the averments and allegations of the amended and substituted answer of the Missouri Pacific Railway Company to the alternative writ of mandamus issued against it, which amended and substituted answer is on file as a part of the record in this case, and here refers to the same and the same is made a part hereof, as fully as if incorporated herein."

The order of the federal court appointing the receiver contains the following:

"(2) That said Receiver be and is hereby authorized and directed immediately to take possession of all and singular said railroads . . . wherever situated or found . . . and to run, manage, maintain and operate said railroads and property, . . . and to use, manage and conduct the business of the defendant Railway Company in such manner as in his judgment will produce the best results and to this end to exercise the authority and franchises of the defendant Railway Company, and to discharge all public duties obligatory upon it and to preserve said railroads and property in proper condition and repair, and to manage and operate said railroads and property according to the requirements of the valid laws of the various States in which the same are situated, and in the same manner that the defendant Railway Company would be bound to do if in possession thereof. . . . .

"(3) That said receiver be and hereby is authorized and empowered to institute and prosecute within this state or elsewhere, and in his own name as receiver, or in the name of the defendant railway company as he may be advised by counsel, all such suits as in his judgment may be necessary for the recovery or proper protection of said property or any part thereof, and the discharge of his trust, and likewise to defend, compromise or settle any and all actions which may be instituted against him as receiver, and to appear in and conduct the prosecution or defense of or compromise or settle any actions, proceedings or suits now pending or which may hereafter be brought in any court or before any officer, department, commission or tribunal in which the defendant railway company is or shall be a party, which, in the judgment of said receiver, affect or may affect the property of which he is hereby appointed receiver; but except upon further order or direction of this court no payment shall be made by said receiver in respect of any such suits, actions or proceedings; and no action taken by the receiver in the defense or settlement of any such actions or suits against the defendant railway company shall have the effect of establishing any claim upon or right in the property or funds in the possession of the receiver so as to alter or change any existing equities or legal rights of the parties."

The bridge whose destruction is demanded by the plaintiff is located near the confluence of the Kansas and Missouri rivers. It is indifferently known in this record as the Kansas City-Northwestern and as the Chicago-Great Western bridge. It spans the river diagonally to the current, stretching nearly north and south. It has four concrete piers in the channel and at each end of the main bridge structure are tubular iron and cement piers, one of the latter standing at the northerly end of the bridge so close to the harbor line and dike embankment that it is of little or no consequence as an obstruction.

The other tubular pier stands about 115 feet inside the harbor line, and supports a steel truss connecting the main bridge structure with an embankment which projects into the stream from the southern or southeastern shore. In this embankment also is some piling designed to strengthen the grade where the bridge and embankment meet. The four main piers of the bridge do not stand parallel with the current, but about thirty-seven degrees athwart it, and at right angles to the direction of the bridge. The superstructure is 1.67 feet below the top of the grade established by the drainage district. From the scores of photographs, diagrams and blue prints submitted, a simple composite diagram of the location and situation of this bridge may assist us in this discussion:

Drainage District v. Railway Co.

This bridge, like the Union Pacific bridge some distance up the stream, was erected shortly after the flood of 1903 to replace one destroyed thereby. This was before the organization of The Kaw Valley Drainage District and before the state began to concern itself methodically with the regulation of

bridges which should be permitted to span the river at Kansas City. The bridge was built by a local company for the use of the Kansas City-Northwestern railway, and later the Missouri Pacific railway became the owner of it. The only interest of the Chicago-Great Western railway in this lawsuit is that of a tenant of the Missouri Pacific, and it uses the bridge under its lease. Both the defendant owner and its tenant are interstate carriers, and both use the bridge in the discharge of their corporate duties as such. The Kansas river spanned by this bridge is a navigable stream in contemplation of federal law. (2 U. S. Stat. at Large, p. 666, ch. 36, § 12; p. 747, ch. 95, § 15.) Its status under state law needs some special discussion which will follow.

The bridge was constructed without the formal sanction and approval of the war department. The plans for its construction were submitted for approval, but the war department officials declined to act, apparently on the ground that the federal government was not then actively exercising control over the Kansas river as a navigable stream; and the applicants for approval of the brige plans were told in effect to go ahead and build their bridge so far as the federal government was concerned, but formal approval and sanction of the bridge was, withheld.

Under Kansas law and Kansas history the status of the Kaw as a navigable stream may be briefly stated. In territorial days, before the civil war and the coming of railroads, the river was navigable and navigated. (*Wood v. Fowler*, 26 Kan. 682, 688.) A considerable commerce was developed extending from its mouth as far west as Fort Riley and Junction City, and occasionally further west. (Vol. 9, Kansas Historical Collections, 1905-1906, p. 317.) During the civil war this commerce greatly declined, and for many years it continued to be inconsequential, although more recently it has somewhat increased. By 1864 it was seen that an era of railroad transportation was at hand. To foster it, the legislature enacted:

"Section 1. That the Kansas, Republican, Smoky Hill, Solomon and Big Blue rivers, within the limits of the state of Kansas, are hereby declared not navigable streams or rivers.

"Sec. 2. Any railroad or bridge company, having a charter under any general or special law of the State of Kansas, shall have the same right to bridge or dam said rivers as they would have had if they never had been declared navigable streams." (Laws 1864, ch. 97.)

This act was repealed by chapter 259 of the Laws of 1913, which, however, provided:

"SEC. 6. For the purpose of this act the bed and channel of any river in this state or bordering on this state to the middle of the main channel thereof and all islands and sand bars lying therein shall be considered to be the property of the State of Kansas unless this state or the United States has granted or conveyed an adverse legal or equitable interest therein since January 29, 1861, A. D., or unless there still exists a legal adverse interest therein founded upon a valid grant prior thereto; provided, that nothing in this act shall affect or impair the rights of any riparian land owner or lawful settler upon any island which is state school land."

The plaintiff contends that the act of 1864 was unconstitutional on the ground that it contained two distinct and separate subjects. We think not. These subjects, a declaration of nonnavigability and a grant of power to bridge the rivers, were correlated, the former serving chiefly as a "whereas" or "preamble" to explain the purpose of the latter and to pave the way for it. Furthermore, this act stood during all the forty-nine years of its existence as valid legislation; rights were acquired and frequently adjudicated under its terms, and it would never do at this late date to throw a doubt around its validity. Moreover, the act of 1913, which repealed it, virtually ratified all rights acquired under the act of 1864. Aside from this act, we have much general legislation which has authorized and encouraged the construction of railroads. To the right of eminent domain, expressly conferred by statute, a grant of corporate power to build a railroad carries with it the power to do all that may be necessary and proper to build it—to level the hills, to grade the valleys, and to bridge the streams along its proposed right of way. (Gen. Stat. 1868, ch. 23, § 47, Gen. Stat. 1909, § 1763.) All this must be done, of course, with due regard to public and private interests; and streams, whether navigable or nonnavigable, must be bridged so as to permit free egress for all flood waters which may reasonably be anticipated. Bearing in mind that such was the Kansas law when this bridge was erected, and that the state's special agent to regulate the bridging of the Kaw at Kansas City and thereabout, the Kaw Valley Drainage District, had not then been created, it can not be said that the bridge in controversy was without legal sanction by this state, unless indeed it was constructed without due regard to public rights and was

and is inherently a serious obstruction to the flow of the river and tending materially to increase the flood hazard in Kansas City. Of that we will speak later.

But the plaintiff says that this bridge is illegal because it was unauthorized by the federal government, under the federal statute (Act of March 3, 1899, 30 U. S. Stat. at Large, p. 1151, ch. 425, §§ 9, 10), which, in effect, provides that the consent of both the state and national governments is required to bridge a navigable stream located in one state. Granted. But unless the bridge as it stands offends against state law, the fact that it was built without federal sanction need not concern the plaintiff. Under our dual system of government, the state and national governments frequently do, and probably always should, coöperate for the more efficient exercise of their respective functions, but each government has its own machinery for the enforcement of its own laws, and it is not the duty and probably not within the powers of either one to enforce the laws of the other unless at the special invocation of the executive.

The mere matter of the navigability of the Kansas river is no concern of the plaintiff, whose duties only relate to such supervision and control of it as is necessary to secure adequate protection against floods; but if the navigable capacity of the, river had always been properly preserved, the flood hazard would be materially less than it is. To that extent the matters of preserving the navigability of the river and its preservation from obstructions which increase the peril of floods coincide harmoniously.

It is also contended by the plaintiff that the statute (Laws 1905, ch. 215) which clothes The Kaw Valley Drainage District with complete and exclusive jurisdiction over the river at Kansas City makes its findings as to the necessity for the demolition of this bridge conclusive and forecloses judicial investigation into the reasonableness of its orders. That goes too far. The plaintiff board is an administrative agency. Within its powers it is supreme. But its orders must be reasonable. And it can not be the final judge of the reasonableness of its own orders. That would be tying administrative and judicial powers in one hand, and this our own constitution will not allow. That was the constitutional rock which wrecked the court of visitation act nearly twenty years ago. (*The*

*State v. Johnson,* 61 Kan. 803, 60 Pac. 1068.) Other public boards with duties almost as onerous as those of this plaintiff, like the public utilities commission, for example, exercise their powers in harmony with this principle. So do the city governments.

Concerning the powers of the public utilities commission, it has been said:

"It will be seen from the foregoing statutes that the legislature has promulgated a comprehensive program for the regulation and control of public service corporations. The public utilities commission . . . has power to supervise the conduct of public service corporations in this commonwealth. It may order improvements in the public service where conditions so demand. (*The State v. Railway Co.,* 76 Kan. 467, 92 Pac. 606; affirmed in *Mo. Pac. Rly. Co. v. Kansas,* 216 U. S. 262; *The State v. Railway Co.,* 81 Kan. 430, 105 Pac. 704; *Railway Co. v. Railway Commissioners,* 85 Kan. 229, 116 Pac. 506; *The State, ex rel., v. Railroad Companies,* 85 Kan. 649, 118 Pac. 872.) Likewise an unreasonable order, such as one requiring the erection and maintenance of a railway station where there was no need for a station, will be corrected on judicial review. (*Railroad Commissioners v. Railway Co.,* 71 Kan. 193, 80 Pac. 53.)" (*The State, ex rel., v. Postal Telegraph Co.,* 96 Kan. 298, 303, 150 Pac. 544.)

Touching the powers of city governments, the same general doctrine is recognized.

"Reasonable changes and improvements in the affairs of public utilities may be ordered at the expense of the public utility company. Thus as a municipality increases its population and business becomes congested, telephone wires may be ordered removed and located elsewhere, railroads may be required to establish new and expensive crossings, larger terminals, additional connections, etc. . (*The State, ex rel., v. Railroad Companies,* 85 Kan. 649, 118 Pac. 872; *City of Emporia v. Railway Co.,* 88 Kan. 611, 129 Pac. 161.) Of course the exercise of such powers must be reasonable, otherwise the courts will withhold or enjoin their enforcement. (*Paola v. Wentz,* 79 Kan. 148, 98 Pac. 775; *City of Emporia v. Railway Co.,* 94 Kan. 718, 147 Pac. 1095; *Telephone Co. v. Utilities Commission,* 97 Kan. 136, 154 Pac. 262.)" (*Water Co. v. City of Wichita,* 98 Kan. 256, 259, 158 Pac. 49.)

It may therefore be said generally that when the state creates an agency to serve its public needs and confers administrative powers upon it, whatever be the language of the statutes conferring such powers, a just and reasonable exercise of such powers is intended, and the power to make or exercise unreasonable, arbitrary and confiscatory orders is not intended.

Such is the spirit of our own bill of rights and of the fourteenth amendment, which have been expounded times without number by this court and by the federal supreme court.

Before examining the reasonableness of the drainage district's order, we will turn to some of the defendant's principal contentions and endeavor to dispose of them.

It is contended that the plaintiff is not the real party in interest and has no right to maintain this action. We hold otherwise. Whatever the state may lawfully do it may provide a public agency to do for it. And this plaintiff has been granted power to make all necessary and reasonable provision for the protection of the people against destruction of life and property by floods in the Kaw valley in and about Kansas City. (Laws 1905, ch. 215, § 7, Gen. Stat. 1909, § 3006.) It is authorized to engage in litigation and to maintain and defend actions pertaining thereto.

It is contended by defendant that the decision of the United States supreme court in *Kansas Southern Ry. v. Kaw Valley Drainage Dist.*, 233 U. S. 75, settles this controversy. If we could be persuaded that that contention is correct, with what relief and alacrity would we lay aside this enormous record, with its endless depositions, its two thousand pages of abstract, its plethora of charts, diagrams and exhibits, its hypothetical coefficients and stupendous show of mathematical calculations touching the volume of water which can pass through the bridge; not to mention the more familiar if not less ponderous field covered by the learned briefs of counsel arrayed in this case. But did the supreme court's decision in the Kansas City Southern case settle this controversy? We do not think so. One paragraph of the syllabus tends strongly to show that that case was presented to the supreme court on the theory that the destruction of the Kansas City Southern railway bridge, which was an essential part of an interstate railway, was sought to be justified because it would "help the drainage of a district." Significant of this is one paragraph of the syllabus, which reads:

"A direct interference by the State with interstate commerce can not be justified by the police power; and so *held* that the destruction of a bridge across which an interstate railroad line necessarily passes can not be justified by the fact that it helps the drainage of a district." (Syl. ¶ 5.)

To the same significant effect is part of the opinion, thus:

"Furthermore in the present case it is not pretended that local welfare needs the removal of the defendant's bridges at the expense of the dominant requirements of commerce with other States, but merely that it would be helped by raising them." (p. 79.)

We can understand a doctrine which holds that as between the respective importance of "helping the drainage of a district" and the maintenance of a bridge which is essential to a highway of interstate commerce the latter must prevail; but here we have to consider, both in substance and in law, the relative importance of a bridge which is an integral part of an interstate highway and the ever-impending menace of that bridge to the lives and property of twenty thousand people in the bottoms of Kansas City, Kan. Can there be any doubt about the relative importance of these propositions? Nothing in the Kansas City Southern case—nothing ever said by the supreme court—warrants the assumption that an interference with interstate commerce could not be tolerated even to avert destruction of human life and the destruction of the homes and business institutions of the people adjacent to an avenue of such commerce. Interstate commerce was made for man, and not man for interstate commerce. The lives and homes of men are of infinitely greater concern than their rights of traffic, state or interstate. Moreover, while congress has jurisdiction over interstate commerce, and, with certain familiar exceptions, its control of such commerce is exclusive, yet congress has expressly extended to the state a part of its regulatory power over bridges like the one in controversy. The federal statute in part reads:

"SEC. 9. That it shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War: Provided, That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single state, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War before construction is commenced. And provided further, That when plans for any bridge or other structure have been approved by the

Chief of Engineers and by the Secretary of War, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War.

"SEC. 10. That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, wier, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War," etc.   (Act of March 3, 1899, 30 U. S. Stat. at Large, p. 1151, ch. 425, §§ 9, 10, 6 Fed. Stat. Ann. 805, 813.)

This statute is a specific recognition by congress itself that notwithstanding its paramount jurisdiction of the means and instrumentalities of interstate commerce, the bridging of navigable waters is likewise one of vital interest to the states, and that they also have a governmental concern as to proper bridging of such waterways.   In *Austin v. Tennessee*, 179 U. S. 343, before the enactment of the statute quoted above, it was declared:

"We have had repeated occasion to hold, where state legislation has been attacked as violative either of the power of Congress over interstate commerce, or of the 14th Amendment to the Constitution, that, if the action of the state legislature were a *bona fide* exercise of its police power, and dictated by a genuine regard for the preservation of the public health or safety, such legislation would be respected, though it might interfere indirectly with interstate commerce.   While, as was said in *Holden v. Hardy*, 169 U. S. 366, 392, 42 L. Ed. 780, 791, 18 Sup. Ct. Rep. 383, 'the police power can not be put forward as an excuse for oppressive and unjust legislation, it may be lawfully resorted to for the purpose of preserving the public health, safety, or morals, or the abatement of public nuisances, and a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what means are necessary for the protection of such interests.'   Thus, while in *Railroad Co. v. Husen*, 95 U. S. 465, 24 L. Ed. 527, it was held that a statute of Missouri, prohibiting the driving or bringing of any Texas, Mexican, or Indian cattle into the state, was in conflict with the interstate commerce clause of the Constitution it was subsequently held that the introduction of diseased cattle might be prohibited altogether, or subjected to such regulations as the legislature chose to impose. *Missouri, Kansas & Texas Railway v. Haber*, 169 U. S. 613, 42 L. Ed. 878, 18 Sup Ct. Rep. 488."   (p. 349.)

The Kansas-Missouri state line comes up from the south a

short distance east of the bridge to a point in the middle of the
Missouri river opposite the mouth of the Kaw, and thence
runs northerly and northwesterly up the main channel of the
Missouri, in the median line of the main current thereof, to
the intersection of the Kansas-Nebraska state line. (*Missouri
v. Kansas,* 213 U. S. 78.) The mouth of the Kaw and all the
navigable portions of it lie west of that boundary line and ex-
clusively in Kansas.

Does the foreclosure suit and the appointment of a receiver
by the federal court necessitate an abatement of this action?
We think not. This court had jurisdiction of the parties and
of the subject matter, and the litigants had incurred great ex-
pense both in the prosecution and defense of this action, long
before the foreclosure suit was instituted. While the action
takes the nature of mandamus, yet by the approved procedure
and practice of this state the scope of mandamus has been
broadened far beyond the limits of the old common-law writ of
that name. It has been invoked approvingly in an action to
require the building of bridges and restoration of highways
which had been obstructed by the ditches of an irrigation com-
pany (*The State v. Irrigation Co.,* 63 Kan. 394, 398, 65 Pac.
681), and this notwithstanding an entire want of statutory
imposition of such duties. In mandamus, in this state, also,
the rights of private citizens to funds paid under protest to a
public officer have been adjudicated. (*The State, ex rel., v.
Akers,* 92 Kan. 169, 140 Pac. 637.) It extends to cases and
persons as to whom no duty is required or sought, but who
may be affected by the judgment. (*The State v. Dolley,* 82
Kan. 533, 108 Pac. 846.) In short, the judicial policy of this
state has been to conform mandamus to the mandate of the
code, which provides:

"The distinction between actions at law and suits in equity, and the
forms of all such actions and suits heretofore existing, are abolished, and
in their place there shall be hereafter but one form of action, which
shall be called a civil action." (Civ. Code, § 10.)

While the inherent differences of actions, suits and special
proceedings remain, yet practically all the ancient artificiali-
ties between actions *in personam,* or *in rem* are abolished, and
our proceedings in mandamus may and frequently do partake
of the nature of both. (Civ. Code, § 580.)

The institution of the federal foreclosure suit did not oust the jurisdiction of this court over the defendant corporation, nor does that suit necessitate an abatement of this action. (*Union Trust Company v. Cuppy*, 26 Kan. 754, syl. ¶ 6; *Kansas City, M. & O. Ry. Co. of Texas v. State*, [Tex. Civ. App. 1913] 155 S. W. 561; High on Receivers, 4th ed., § 318; 5 Thompson, Commentaries on the Law of Corporations, §§ 6894-6896.) It is not intimated that the federal receivership is intended to wind up and conclude the corporate existence of the Missouri Pacific Railway Company. Indeed the order of the federal court plainly shows that it is intended that the corporation shall continue to discharge its functions just as if the president and board of directors were still in charge. The federal receiver for the time being represents the corporation. Even if this action had not been already pending at the time of the receiver's appointment, he might be subjected as a defendant to this action. (U. S. Jud. Code, § 66; *Erb v. Popritz*, 59 Kan. 264, 52 Pac. 871; *Railroad Commission of Alabama v. Ala. Great Sou. R. R. Co., et al.*, 185 Ala. 354; *Grant v. Buckner*, 172 U. S. 232, 238; *Nashville Ry. & Light Co. v. Bunn*, 168 Fed. 862.) It is proper and good practice to bring him in as a defendant in a case already pending against the corporation before his appointment. (*Black v. Power Co.*, 158 N. Car. 468.) The order of the federal court appointing him commands him to obey all valid state laws; and the lawful orders of the plaintiff board have the potency of law. (U. S. Jud. Code, § 65; *Reinhart v. Sutton*, 58 Kan. 726, 51 Pac. 221; *Black v. Power Co.*, supra.)

In *Erb v. Morasch*, 177 U. S. 584, it was said in the syllabus:

"It is the duty of a receiver appointed by a Federal court to take charge of a railroad, to operate it according to the laws of the State in which it is situated, and he is liable to suit in a court other than that by which he was appointed, even in a state court, for a disregard of official duty which causes injury to the party suing." (Syl. ¶ 2. *Gableman v. Peoria &c. Ry. Co.*, 179 U. S. 335. See, also, a note on this point in 37 Ann. Cas. 1248.)

Another contention of defendant is that it did not receive due consideration from the plaintiff's board before the order for the removal of the bridge was issued, and that the members of the board made the order pursuant to preëlection promises that they would not tolerate any bridge across the

river having more than two piers. The circumstances were unusual. The people had suffered terribly by floods. The likelihood of their recurrence was obvious. Doubtless the public was wrought up about the matter, and the public knew that the army engineers had recommended the adoption of a two-pier plan for all bridges at Kansas City. But the members of the board testified that if they had been convinced that a bridge of more than two piers would not have increased the flood hazard they would have voted to sanction it, although they did not deny the preëlection agitation and their sympathy with it. In any matter of such general interest as flood protection in Kansas City it would be asking entirely too much of mere laymen to keep their minds open and uncommitted on such matters likely to come before them later for official consideration. Lawyers and judges trained in the art of jurisprudence, which requires a suspension of the judgment until all sides of a controversy have been fully considered, can do this; but if such high standards of mental neutrality are absolutely essential to qualify for membership in administrative boards, the whole system of administering governmental functions by boards and commissions of laymen will fail. The remedy for such prejudgments is not wanting, however. The redress of such grievances is usually taken care of when the courts are called on to test the reasonableness of the official orders of these boards. The defendant, by its counsel, officers and engineers, was given several hearings before the plaintiff board. We can not say that the defendant had no hearing before the order of removal was made. There were discussions, conferences and negotiations for compromise and settlement. This was sufficient. In *Meffert v. Medical Board*, 66 Kan. 710, 72 Pac. 247, affirmed in 195 U. S. 625, it was said:

"It is contended that the procedure before the board in the admission and rejection of evidence was violative of the rights of Meffert, in that the evidence received and acted upon was made up largely of unsupported accusations, hearsay and street rumor, and was not sufficient to sustain the findings. The provisions of the act creating the board plainly indicate that such investigation was not intended to be carried on in observance of the technical rules adopted by courts of law. The act provides that the board shall be composed of seven physicians. These men are not learned in the science of law, and to require of a board thus composed that its investigations be conducted in conformity to the technical rules of a common-law court would at once disqualify it from making any investigation." (p. 715.)

Coming now to the paramount question, it will be noted that the bridge is illegal so far as congress itself can denounce it. It was built without official approval of the war department, and thus in violation of federal law. The power to construct a bridge of some character has been granted by the state, but no authority has been granted to build it in such manner as to obstruct unduly the flow of the river or to increase the flood hazard and to imperil the lives and property of thousands of people. By necessary implication every grant of power to build a bridge across a Kansas stream, navigable or nonnavigable, carries with it the mandate to build it with due regard to public rights and with the inhibition to build it in any improper manner. (*Union Trust Company v. Cuppy,* 26 Kan. 754, syl. ¶ 3.) A grant of power by the public is never to be interpreted as a privilege to injure the public. (Kansas Bill of Rights, § 2.)

Does this so-called Chicago-Great Western bridge as it now exists do this? Neither in the answer to the writ nor in the evidence is there any serious attempt to deny it. A flood like that of 1903 would make short work of this bridge. To such a flood it would be of trifling consequence. How it outlived the floods of 1904 and 1908 does not appear. But for the interposition of this court, that additional riprapping might be used temporarily to protect the southeastern embankment, and to preserve the existing status of the bridge while the litigation was pending, and over the plaintiff's insistent and weighty objections, the flood of last year, 1915, would have undermined and destroyed it. Driftwood, ice floes and debris do lodge against its piers, and in the future this is likely to increase since the other bridges up the river have been reconstructed with a view to give all such flotage free passage downstream.

The chief defense, aside from many interesting questions of law most exhaustively presented, is that the order requiring the entire demolition of the bridge is unreasonable; that it would entail needless expense; that the sort of bridge which the plaintiff would approve would pass no more flood waters than the present bridge if the defendant were permitted to raise the superstructure, to remove the south tubular pier, to remove the south embankment and riprap inside the harbor and dike lines, and to build a new span on the southerly end of

Drainage District v. Railway Co.

the main structure reaching to the main shore, all of which defendant avows that it is ready and at all times has been ready to do. Both plaintiff and defendant placed on the witness stand a number of the leading civil engineers of North America, also army engineers distinguished in talents and achievements, to enlighten the court concerning the flood-carrying capacity of this bridge, and of its relative capacity to that of the Missouri Pacific and Union Pacific bridges some distance up the stream. This evidence is highly technical and amazingly voluminous, and it is only because of unavoidable responsibility that we dare to weigh and decide the facts so dogmatically affirmed and so positively denied by these eminent experts. However, by invoking our own general notions of things, we incline to hold with plaintiff's expert witnesses that a pier set at an angle of thirty-seven degrees to the current of a stream is a much greater obstruction than one set with its narrowest end facing and its longest side parallel to it, and that in just so much as the pier set angularly exceeds the area of the end of a parallel pier, the obstruction is so much the greater. We are inclined to hold that since this bridge sits diagonally across the stream and a cross-section of flood waters would strike but one of the piers at the same time, the obstructive force of this bridge's four concrete piers can not be reckoned by computing four times the obstructive force of one pier. But we would hesitate to adopt the theory that it is like the obstructive force of four bridges of only one pier each. The four piers do not fall directly below each other in the current, but more in stepladder fashion, each being a material obstruction and deterrent to the stream's general course. The evidence touching the hydraulic head developed by the bridge piers and the hypothetical estimates touching the scour line, besides being too conflicting for the court's enlightenment, is too subtle, we think, for the adjudication of practical rights in a controversy of this sort; although it can be readily understood that every pier does develop some hydraulic head, and that floods do tend to deepen the scour line to some extent. We do hold, upon all the evidence, that the bridge, as maintained, tends seriously to create and increase the flood hazard at Kansas City, and that it is a constant menace to life and property thereabout whenever the

Kansas river begins to approach flood stage, and critically so when the river mouth is blocked by a concurrent flood in the neighboring Missouri river. We also hold that the bridge was constructed without regard to these consequences, and in these respects it was built and has been maintained without lawful sanction by this state, and since we have seen that it never did have federal sanction of any sort, it is unlawful and a public nuisance.

We must now consider what ought to be done in view of this conclusion. This bridge ought not to be demolished if such a drastic remedy can be avoided. It is an integral part of an interstate highway, and its destruction would interfere with and hinder interstate commerce, although there are other but more circuitous routes in Kansas City by which the defendant's traffic could move across the river. The bridge cost $172,765, and since it has only been constructed a few years it has deteriorated but little. The price of bridge materials has greatly increased, and the expense of a new structure, built according to the plaintiff's and the war department's new regulations for bridging the river at Kansas City, would be much greater than the cost of this bridge. Defendant's engineer estimates the cost of reproduction at $242,700. It was erected, like the Missouri Pacific and Union Pacific main-line bridges, before The Kaw Valley Drainage District was created and its rules for bridges promulgated. A modification of the drainage board's bridge regulations was allowed on the Missouri Pacific and Union Pacific main-line bridges partly on that account. If possible to do so without increasing the flood hazard, similar consideration should be given in the case of this bridge. The defendant has avowed its willingness to improve the flood-carrying capacity of the bridge at an estimated outlay of $80,000. We can not determine from the record whether this will be sufficient to answer the purpose or not, because both parties have been so positive in their contentions, and so diverse in their views, that the probability of such a solution has not received the attention it deserves. It seems, therefore, that no final judgment should yet be entered. We believe we have disposed of those phases of this controversy most seriously in dispute; and, as has been shown, we can not altogether adopt the views of either party. Those features of the controversy which we have undertaken to settle should

now be laid aside, and the litigants should confer together, with the aid of their expert engineering advisers, and should consider the feasibility of improving and reconstructing the bridge without destroying it, to the end that its capacity for mischief in times of flood shall no longer threaten the public welfare. One feature of the case which is also worthy of further consideration by the plaintiff board is the defendant's contention that a slight and inexpensive increase in the height of the dike in the vicinity of the bridge would counteract the hydraulic head developed by the bridge piers. We believe that if these problems are now approached in good faith by both parties, a solution will be discovered. To await that and to make any further needful interlocutory order or final judgment, jurisdiction of the cause is retained.