No. 28,029.

THE STATE OF KANSAS, ex rel. ARTHUR J. MELLOTT, as County Attorney of Wyandotte County, *Plaintiff*, v. E. L. MASON, C. W. BRENNEISEN and J. W. SILVERS, as Directors of The Kaw Valley Drainage District of Wyandotte County, *Defendants*.

(267 Pac. 31.)

Opinion filed May 5, 1928.

*Arthur J. Mellott,* county attorney, *H. J. Emerson,* deputy county attorney, and *J. O. Emerson,* of Kansas City, for the plaintiff.

*C. W. Trickett,* of Kansas City, for interveners the Stewart Sand Company, the Muncie Sand Company and the American Sand Company.

*Thomas A. Pollock,* of Kansas City, for the defendants.

The opinion of the court was delivered by

HARVEY, J.: This is an original proceeding in quo warranto by the state, on the relation of the county attorney, inquiring by what authority the defendant drainage district has engaged in the business of conducting a sand plant for profit, and for a declaratory judgment construing certain state statutes, and particularly R. S. 24-408. The petition alleges that defendant was organized under chapter 215 of the Laws of 1905 (R. S. 24-401 *et seq.*); that defendant and its directors are making arrangements to engage in the private business, to wit, the taking of sand from the Kansas river and preparing the same for market, and to market the same at wholesale or retail, and for such purpose have purchased a tract of ground, paying for the same the sum of about $8,000, and have erected a tipple and other equipment for the preparation of sand for the general market, and a crane for loading trucks, and are arranging for the construction of railroad tracks to reach the sand plant, and are intending to use the dredge boat belonging to the drainage district, which was purchased for the purpose of dredging the river and keeping the channel clear of obstructions to pump sand for the

sand plant, and that the employees of the sand plant are carried on the pay roll of the drainage district and paid out of money raised by taxation; that defendant has contracted with parties to sell sand for building and street-paving purposes. It is alleged that these acts are not authorized by statute, and if R. S. 24-408 should be so construed as to authorize the same it is unconstitutional. Several sand companies operating sand plants in or near the drainage district asked leave to intervene on the part of the plaintiff, which request was granted. In its answer defendant admitted its organization as a drainage district under chapter 215 of the Laws of 1905, and alleges it has the powers authorized by that statute and statutes supplemental thereto; that the drainage district has constructed levees along the banks of the Kansas river for a distance of approximately nine miles, and has widened, deepened, enlarged and improved the channel of the river at an expense of $1,750,000; that the district has not yet secured adequate flood protection; that it has employed several engineers to advise defendant as to what flood protection work would reasonably be necessary for the protection of life, business and property in the district, and as to the probable cost thereof; that several of the engineers have reported that adequate flood protection for the district would cost approximately a million and a half dollars in addition to the sum heretofore expended, and one engineering company reported that to care for flood waters such as the flood of 1903 would require an expenditure of approximately $7,000,000; that in any event it will cost several million dollars to provide the flood protection necessary for the safety of life and property in the drainage district; that for the payment of interest on bonds previously issued and providing a sinking fund and a general fund the taxes in the district are already so heavy that the directors of the drainage district do not deem it advisable to issue additional bonds, or levy special assessments, or increase the tax rate for the construction and maintenance of additional flood improvement; that the present board of directors, elected in March, 1926, declared in their platform for election, "We favor the use of the dredge for the production of sand for sale," and that the directors of the defendant deemed it necessary, advisable and for the best interests of the district to operate a sand plant for the sale of sand to secure funds for the construction and maintenance of flood protection work; that the defendant district and board of directors duly found, declared, decided and ordered

that it was necessary to the exercise of its corporate, legislative and administrative powers, and to the accomplishment of the purpose of its organization, and to secure funds necessary to provide flood protection improvement necessary to the safety of life and property in defendant district, to take from the Kansas river—a navigable river within the corporate limits of the district—sand, and to sell the same and to use the proceeds for the construction and maintenance of levees and river walls and for dredging and other improvements necessary and authorized to be made by the defendant district; that on November 30, 1926, defendant, by resolution, provided for the purchase of a tract of land to be used for a sand plant; that the defendant district is using its hydraulic dredge, of the value of more than $50,000, in the operation of its sand plant, and has purchased machinery and appliances necessary to the operation of the sand plant at a cost of $29,117.70; that defendant has expended in securing land and the installation of equipment and operation thereof, since November 30, 1926, out of the general fund of the district, approximately $36,683.96; that it has sand now on the ground at the plant of the approximate value of $10,000, and has sold sand to the amount of approximately $2,319.04, and that defendant's directors believe that they can successfully and profitably operate the sand plant; that the plant is now in actual operation, producing merchantable sand. Defendant further alleges that the business of producing sand for sale, for use generally in Kansas City, Kan., is controlled and practically monopolized by a few corporations, which charge substantially the same prices for their products, and demand, charge and receive unreasonable and excessive prices therefor, and that it will be for the best interests of the public to establish and maintain a sand plant at which sand can be purchased by all persons for reasonable prices; that the pendency of this suit prevents defendant from entering into contracts for the sale of sand in wholesale quantities and expending money for the purchase of machinery and equipment and enlarging its plant; that defendant will suffer irreparable injury and be compelled to increase the rate of taxation for drainage district purposes unless it can avoid doing so by the operation of the plant, and that defendant will suffer injury if forced to sell its plant on account of want of authority to operate the same. It alleges that it has ample authority to operate the plant under the statute, and particularly under R. S. 24-408.

Plaintiff has moved for judgment upon the pleadings filed. This presents the issues—whether the drainage district is authorized, under the statute, to construct and operate a sand plant for profit, the proceeds to be used for flood protection work, and the secondary question, whether it is authorized to use its general fund to purchase the land and equipment and to pay employees necessary for the operation of the sand plant.

At the first regular session after the disastrous floods, especially in the Kansas river valley, of 1903, our legislature enacted a comprehensive statute (Laws 1905, ch. 215), for the creation of drainage districts. The general purposes to be accomplished are well stated in the title of the act as follows:

"AN ACT in relation to natural watercourses, providing for the protection, control, deepening, widening, removing obstructions from, changing, regulating, establishing and maintaining the channels thereof; the construction, maintenance and repair of levees along the same to prevent overflow and the raising or elevation of railroad tracks and public highways that interfere with the construction and maintenance of such levees; the construction and regulation of drains and other works conducive to the public health, convenience and welfare in districts subject to overflow; and to these ends providing for and authorizing the organization of public corporations to be known as drainage districts, and prescribing the duties and defining the powers of such public corporations."

The act provides, among other things:

"That each drainage district incorporated under the provisions of this act shall be a body politic and corporate, and (subject to the superior jurisdiction of the United States over navigable waters) is hereby granted exclusive control of the beds, channels, banks and of all lands the title to which is vested in the state of Kansas lying between the banks at high-water mark of all natural watercourses within such district." (R. S. 24-407.)

And the drainage district was given power—

"Fourth. To take charge of and exercise exclusive control over all natural watercourses within its territorial limits and to so widen, deepen, establish, regulate and maintain the channels thereof, and to construct and maintain such levees along the banks thereof as may be deemed necessary or proper to prevent or restrain overflow or lessen the volume thereof or the injury deemed likely to result therefrom; also to make and maintain such ditches, drains, sewers and canals through lands subject to overflow as may be deemed necessary to carry off and prevent water from standing or remaining in pools or ponds and becoming stagnant upon overflowed lands, or as may be deemed necessary for sanitary purposes or conducive to the public health, convenience, and welfare; also to alter, change or abandon the channel or any part of the channel of any natural watercourse and relocate or excavate and establish a new channel for such watercourse or any part thereof situated within the

district, and to these ends may take private property for public use by exercise of the right of eminent domain in the manner hereinafter provided; and may condemn and cause obstructions in such watercourses to be removed; and may acquire by gift, purchase or condemnation such lands for the purpose of constructing levees along or widening, deepening, changing or otherwise improving the channels of such watercourses or for relocating, excavating and establishing new channels or constructing cut-offs, as may be deemed necessary." (R. S. 24-407.)

Other specific powers, in harmony with those in the provision quoted, were specifically granted. To pay the expense of all of this the district was given power (1) to levy an annual tax on the property in the district to create a general fund, (2) to levy special assessments on property specifically benefited, to defray the cost of construction and maintenance of levees or other works, and (3) to issue bonds to pay the costs of widening, deepening or otherwise improving the channels and constructing embankments, drains, levees and other works.

The defendant drainage district was organized under this act. The Kansas river, from its junction with the Missouri, west for several miles, is within the district. It has built levees and performed other duties authorized by the act, as stated generally in its anwser. A drainage district so created is a quasi municipal corporation, an arm of the state, created by the legislature to perform a function of government, namely, to provide a drainage system for the district. See *Roby v. Drainage District*, 77 Kan. 754, 95 Pac. 399; *Jefferson County v. Drainage District*, 97 Kan. 302, 155 Pac. 54; *State, ex rel., v. Drainage District*, 102 Kan. 575, 171 Pac. 634; *Euler v. Rossville Drainage District*, 118 Kan. 363, 235 Pac. 95; *State, ex rel., v. Drainage District*, 123 Kan. 191, 254 Pac. 372.

In 1913 our legislature enacted what is commonly known as the sand and gravel act (Laws 1913, ch. 259) in which the state was declared to be the owner of any sand, oil, gas, gravel or other mineral, in the bed of any navigable stream in the state; and made it unlawful for any person, firm or corporation to take any part of it therefrom, without obtaining consent of the executive council, and upon such terms as it deemed just, the compensation therefor to be paid to the state. The act did not prevent the taking without payment of sand or gravel to be used exclusively for public highways, public buildings or other public use, or by the person taking the same for his own domestic use, and provided that if the taking was from a drainage district, organized under chapter 215

of the Laws of 1905, one-third of the proceeds should be returned to the drainage district and two-thirds retained by the state. This act was tested in this court (*State, ex rel., v. Akers*, 92 Kan. 169, 140 Pac. 637), and held valid, in April, 1914, and the decision affirmed by the supreme court of the United States (*Wear v. Kansas*, 245 U. S. 154).

In 1917 our legislature passed an act in relation to drainage districts organized under chapter 215 of the Laws of 1905, and delegating to such district certain powers, as follows:

"All drainage districts incorporated under the provisions of chapter 215 of the Session Laws of 1905, shall have power: First, to take from any navigable river within their corporate limits, sand, gravel, rock, or other minerals, without the payment to the state of any compensation therefor, and sell the same and use the proceeds in the construction or maintenance of levees, or river walls, or for dredging, or other improvements authorized to be made or maintained by such districts. Second, to construct and maintain streets upon, along, adjoining or over any river wall, dike or levee, and approaches thereto from adjacent or intersecting streets, and to contract with any city or other municipal corporation in which the same may be situated, or with any private corporation or person, for the making of such improvements, or for the payment of a portion of the cost thereof, and to levy taxes and issue bonds, in accordance with and subject to the provisions of chapter 215 of the Session Laws of 1905, and acts amendatory thereof, to pay the cost of such improvements. Third, to contract or otherwise coöperate with any city or other municipal corporation in which the same may be situated, or with any corporation or person, for the construction and maintenance of sewers, drains, or ditches for the drainage of any drainage district or portion thereof, or to prevent the same from being overflowed by surface water from adjoining lands, and to levy taxes and issue bonds in accordance with and subject to the provisions of chapter 215 of the Session Laws of 1905, and acts amendatory thereof, to pay for the cost of such improvements." (R. S. 24-408.)

Defendant concedes in its brief that prior to the enactment of the statute last quoted it had no power to go into the business of operating a commercial sand plant for profit, but contends that this statute granted a new plenary power in that respect; that it was intended by this statute to provide funds for improvements and maintenance of improvements without taxation, by a new method; that the purpose of the act is to confer the general power to take and sell sand, by such method and under such circumstances as the board of directors of the district deem advisable, and, presumably, in such quantities and for such price and on such terms as the directors deem prudent.

In accordance with the scope and purpose of our constitution, and especially section 8 of article 11, it is our policy for neither the state nor subdivisions to engage in any purely commercial enterprise. In *State v. Kelly,* 71 Kan. 811, 836, 81 Pac. 450, it was said:

"It has been the policy of our government to exalt the individual rather than the state, and this has contributed more largely to our rapid national development than any other single cause. Our constitution was framed, and our laws enacted, with the idea of protecting, encouraging and developing individual enterprise, and if we now intend to reverse this policy, and to enter the state as a competitor against the individual in all lines of trade and commerce, we must amend our constitution and adopt an entirely different system of government."

See, also, *National Bank v. City of Iola,* 9 Kan. 689; *State, ex rel., v. Osawkee Township,* 14 Kan. 418; *McConnell v. Hamm,* 16 Kan. 228; *City of Geneseo v. Gas Co.,* 55 Kan. 358, 40 Pac. 655; *State v. Lawrence,* 79 Kan. 234, 100 Pac. 485; and *Savings and Loan Assoc. v. Topeka,* 20 Wall (U. S.) 655; and *Com. Nat. Bank of Cleveland v. Iola City,* 22 L. Ed. 463, construing Kansas statutes.

The question before us is to determine whether the legislature, by enacting the statute last quoted, intended to make a complete change of its policy in this respect (if indeed it had constitutional authority to make such a change), and to confer on drainage districts full authority to engage in what has always been regarded, and in fact is, a purely commercial enterprise, even though the language used, broadly interpreted, might be so construed. Our answer must be in the negative.

Unless a contrary intent clearly appears, statutes are presumed to have been enacted with the view that they will be interpreted, not only in accordance with the constitution of the state, but in accordance with a definitely known public state policy. So viewed the broad language of the statute is greatly restricted.

The statute in question refers to the statute authorizing the creation of drainage districts (Laws 1905, ch. 215; R. S. 24-404 *et seq.*), and must be construed in accordance with the general purpose of that act. That purpose has been heretofore defined by this court. The act authorizes the creation of drainage districts for the purpose of carrying out a governmental function; namely, the drainage of overflow land. (*Railway Co. v. Montgomery County,* 93 Kan. 319, 144 Pac. 209; *Drainage District v. Railway Co.,* 99 Kan. 188, 161 Pac. 937; *Todd v. Drainage District,* 109 Kan. 754, 201 Pac. 1096),

and cases cited, *supra*. The legislature had no intent to create quasi municipal corporations for the purpose of conducting a purely commercial enterprise.

Construing the statutes heretofore cited, as above indicated, it seems clear that the statutes of 1917 simply authorize the drainage district to sell such sand, gravel, etc., as might be produced in performing the functions for which it was created, without paying any of the royalty provided by the sand and gravel act, and this without respect to whether it was sold for the building of roads or other governmental purposes.

But defendants contend that if the statute be so interpreted, then it is really useless for the reason that sand taken in the ordinary dredging of the river, removing sand bars and the like, is not in condition to be sold until it is washed, cleaned and graded, and that these operations require a sand plant. It is much better that the statute be so construed as to have no useful purpose than to construe it so as to create a power directly opposed to our definite state policy, as provided in our constitution and elsewhere, that the state, or its municipal subdivisions, shall not engage in purely commercial enterprises.

The conclusion we have reached makes it unnecessary to discuss at length any other question argued. It necessarily follows that defendants have no authority to use money raised by taxation for the purchase of land and equipment, and employing men to conduct a sand plant as a purely commercial enterprise.

Judgment will be entered for plaintiff.