No. 34,442

THE STATE OF KANSAS, ex rel. TOM HARLEY, County Attorney, and THE RIVERSIDE DRAINAGE DISTRICT OF SEDGWICK COUNTY, *Appellees*, v. DOLESE BROTHERS COMPANY et al., *Appellants*.

(102 P. 2d 95)

Opinion filed May 4, 1940.

*Earle W. Evans, Joseph G. Carey, W. F. Lilleston, George C. Spradling, Henry V. Gott, George Stallwitz, A. M. Buzzi, Paul Donaldson, Eldon Wallingford,* all of Wichita, *Warden L. Noe* and *Jay S. Parker,* both of Topeka, for the appellants.

*Tom Harley,* county attorney, and *Jean Madalene,* of Wichita, for the appellees.

The opinion of the court was delivered by

SMITH, J.: This was an action by the state in the name of the county attorney of Sedgwick county and the Riverside Drainage District against the chief engineer of the division of water resources and a sand company to cancel a permit issued by the chief engineer to the sand company, allowing it to return to the bed of the Arkansas river refuse sand it had pumped from the river in operating its sand plant, and to enjoin the company from further maintaining a sand dump in the bed of the river. Judgment was for plaintiffs. Defendant appeals.

After setting out the official character of the parties, the petition alleged that the drainage district was organized under chapter 215 of the Laws of 1905, as amended by chapter 174 of the Laws of 1929; the limits of the district were then set out—that it comprised about 6,000 acres and was not adjacent to a drainage district on its north boundary. . The petition then alleged Dolese Brothers Sand Company operated a sand plant along the north bank of the Arkansas river at a site about 500 feet upstream from the west side of the John Mack bridge; that opposite the sand plant along the south bank of the river plaintiff had constructed a levee for the purpose of elevating the south bank and preventing a flood within its district and that the natural bank on the north side of the river was higher than the natural bank on the south side. The petition then alleged that the defendants illegally combining together engaged in a scheme to thwart the powers of plaintiff, because on or about October 14, 1937, Dolese Brothers obtained from the chief engineer a purported permit to maintain a sand dump in the bed of the river within the territorial jurisdiction of the district; that the sand company, acting in pursuance of the schemes, created and was maintaining a sand dump about 500 feet west of the John Mack bridge; that the maintenance of this sand dump caused the normal current of the river against the south bank to be augmented and was causing the water to cut behind the established south bank line, and if permitted to be so maintained would force a channel, whereby the levee would be rendered useless as a protection to the property, and there was no adequate remedy at law; that these things were done for the purpose of interfering with plaintiff's duty in the matter of protecting its property and was collusively granted and was void because—

(a) The chief engineer had no jurisdiction over watercourses within the plaintiffs' district.

(b) That the chief engineer erred in his conception of his duties because the purported permit showed on its face that it was not to promote the public welfare, but to promote the private needs of Dolese Brothers, and that it was a collusive attempt to exercise the police power of the state for the protection of Dolese Brothers and not within the letter or spirit of Laws of 1929, chapter 203.

(c) That defendant engineer made no investigation of the past flood conditions at the point in question, but in disregard of his official duties and conniving with his co-defendant, granted the purported permit.

(d) That the application for the permit was not accompanied by maps, profiles and specifications of said water obstruction or of any changes or additions proposed to be made and such other data and information as would enable the chief engineer to act with knowledge in the premises.

(e) That chapter 203 of the Laws of 1929, under which the purported permit was granted, was unconstitutional and void because no standard or rule was provided in the statute upon which the chief engineer could base a discretionary power thereby leaving the granting of a license to maintain a public or private nuisance to the arbitrary and unregulated discretion of the chief engineer of the division of water resources regardless of what might be right and proper or within the contemplation of the legislature.

(f) That chapter 203, Laws of 1929, was void because it was an unwarranted delegation of power to license a nuisance.

(g) That the discretion vested in a public officer by chapter 203, Laws of 1929, was in violation of the 14th amendment of the constitution of the United States.

(h) That the purported permit, if otherwise valid, was void because it was unwarranted, in fact, unreasonable and collusively issued.

To this petition certain motions to strike were filed by Dolese Brothers. These motions were overruled.

The chief engineer admitted in his answer the organization of the drainage district and of the sand company, denied that he was at that time chief engineer of the water resources and asked that the case be dismissed as to him.

The Dolese Brothers Company filed a general denial.

It will be noted that the petition contained many allegations of fraud and collusion against defendants. When the case was tried the trial court did not find any of these allegations to be true, but, on the other hand, when defendants offered to introduce evidence to meet the charges of fraud and collusion, refused to allow such evidence to be introduced, stating there had been no evidence offered by plaintiffs to sustain it. We are unable to find any evidence of fraud or collusion on the part of defendants. On that account, and

for the present at least, we shall consider the case as though the petition contained allegations that the sand company was operating a sand plant and obtained from the chief engineer a permit to maintain a sand dump in the river within the territory of the district and was maintaining the sand dump; that the sand dump caused the normal current of the river to cut behind the south established bank line and if permitted to be so maintained would force a channel and the levee would be destroyed.

At the conclusion of the evidence of plaintiffs, defendants demurred to it. This demurrer was overruled.

With the petition thus shorn of the allegations of fraud and collusion, attention should next be directed to finding of fact No. 18, as follows:

"At a point to the south of the sand pile, the river has cut to the south of the south established bank line about thirty feet, as shown by defendant's exhibit 1, which was caused in part by the island of mud and clay approximately 175 to 200 feet in length and about thirty to forty feet in width, and also by the deflection of the flow of the water which is directed into the sand pile and deflected to the south and flows against the south bank of the river, causing the river to cut into the south of the south established bank line. The island has been pumped out by the defendant, Dolese Brothers, and the only thing now causing the water to be deflected to the south, is that caused by the deflection caused by the sand pile."

Other findings were made. Many of the facts found were not disputed by the parties and will be referred to later on in this opinion.

The trial court made the conclusions of law as follows:

"No. 1. The sand pile composed of fine sand and silt maintained by Dolese Brothers, creates a nuisance and an obstruction to the flow of the Arkansas river and changes the cross current of said river.

"No. 2. The State of Kansas, ex rel. Eli Eubanks, county attorney, and the Riverside Drainage District of Sedgwick County, Kansas, are entitled to an injunction enjoining the defendant, Dolese Brothers, from maintaining said sand dump pursuant to the terms of the permit granted by the chief engineer of the Division of Water Resources, of the state of Kansas; unless the said defendant shall, at its own cost and expense, construct or install jetties on the south bank of the Arkansas river at the point in question, or construct or install other engineering devices, to protect said bank from being cut away by the deflection of the water from the sand pile to the south bank, all within thirty days from the filing of these findings and conclusions and pay the costs of the action.

"In the event that the defendant, Dolese Brothers, fail, neglect or refuse to comply with the conclusions herein reached, within the time herein specified, said injunction shall be in full force and effect and that the said permit granted by the chief engineer of the Division of Water Resources shall be canceled."

Before the introduction of any evidence plaintiff asked and secured permission to amend the prayer of the petition by adding the following:

"And ordering said obstruction removed and the available stream bed restored to the condition in which it existed prior to the obstruction complained of."

After the findings of fact and conclusions of law were made the defendants filed motions to modify and set aside and make additional findings of fact and conclusions of law and for a new trial. These motions were denied, except that conclusion of law·No. 2 was modified by striking out all after the word "unless" and substituting therefor the following:

"Defendant Dolese Brothers Company be enjoined from deflecting the channel in any manner to cause the cutting of the natural banks back of the established bank lines, and to pay the costs of this action."

The final journal entry recited that the journal entry formerly entered should be amended in like manner. Thus, the final judgment, if the language used by the court be taken literally, was: ·

"It is considered, ordered and adjudged by the court that the defendants, Dolese Brothers Company, a corporation, be and is hereby enjoined from maintaining a sand dump pursuant to the terms of the permit granted on the 14th day of October, 1937, by the chief engineer of the Division of Water Resources of the state of Kansas and . . .

"Defendant Dolese Brothers Company be enjoined from deflecting the channel in any manner to cause the cutting of the natural banks back of the established bank lines, and to pay the costs of this action."

Defendants appealed from the judgment rendered on March 6, 1939, when the findings of fact and conclusions of law were made, and from the judgment of March 24, when the order passing on the motions to modify, set aside and make additional findings of fact and conclusions of law was passed on, and the motion of defendants for a new trial was overruled.

The defendants assign fifteen specifications of error. It will not be necessary to notice all these in detail.

The first argument made by defendants is that the state division of water resources had superior jurisdiction to the drainage district. The consideration of this argument will require an examination of the statutes providing for the organization of drainage districts and the later statutes whereby the state undertook to exercise a general supervisory jurisdiction over drainage and flood control.

The act under which this district was organized was passed in

1905 as a result of the disastrous floods of a year or two before. It was chapter 215 of the Laws of 1905, and its main features appear as G. S. 1935, 24-401, and the following sections. By these sections broad powers were conferred on drainage districts, among them being the following from G. S. 1935, 24-407:

"That each drainage district incorporated under the provisions of this act shall be a body politic and corporate, and (subject to the superior jurisdiction of the United States over navigable waters) is hereby granted exclusive control of the beds, channels, banks and of all lands the title to which is vested in the state of Kansas lying between the banks at high-water mark of all natural watercourses . . . within its territorial limits, and to so widen, deepen, establish, regulate and maintain the channels thereof and to construct and maintain such levees along the banks thereof as may be deemed necessary or proper to prevent or restrain overflow or lessen the volume thereof or the injury deemed likely to result therefrom; also to make and maintain such ditches, drains, sewers and canals through lands subject to overflow. . . ."

A fine discussion of the historical background for this act and of the general powers conferred on drainage districts by its terms is found in *Drainage District v. Railway Co.,* 99 Kan. 188, 161 Pac. 937. This was an action whereby the drainage district sought a writ of mandamus to compel a railway company to remove one of its bridges across the Kansas river because its general structure was such as to constitute a flood hazard. This court reviewed the history that led to the passage of the drainage district act and pointed out that this was the means by which the state sought to take action that would prevent a recurrence of the disastrous floods of former years. The drainage district contended that the statute gave it exclusive jurisdiction over the river so as to preclude judicial investigation into the reasonableness of its orders. The court said:

"That goes too far. The plaintiff board is an administrative agency. Within its powers it is supreme. But its orders must be reasonable. And it cannot be the final judge of the reasonableness of its own orders. That would be tying administrative and judicial powers in one hand, and this our own constitution will not allow. - That was the constitutional rock which wrecked the court of visitation act nearly twenty years ago. (*The State v. Johnson,* 61 Kan. 803, 60 Pac. 1068.) Other public boards with duties almost as onerous as those of this plaintiff, like the public utilities commission, for example, exercise their powers in harmony with this principle. So do the city governments." (p. 204.)

This court then cited decisions with reference to the powers of the public utilities commission, and of cities, and then said:

"It may therefore be said generally that when the state creates an agency to serve its public needs and confers administrative powers upon it, whatever be the language of the statutes conferring such powers, a just and reasonable

exercise of such powers is intended, and the power to make or exercise unreasonable, arbitrary and confiscatory orders is not intended. Such is the spirit of our own bill of rights and of the fourteenth amendment, which have been expounded times without number by this court and by the federal supreme court." (p. 205.)

This case is of interest to us here because it is about the first opinion of this court considering the powers of drainage districts, also because it lays down the test of reasonableness for the validity of the orders of the district. It should be remembered, too, that this act marked the first effort on the part of the state to take some action to prevent floods. Since 1905, and the decision in the above case, many districts have been organized along the other streams in the state and a great deal of litigation has been carried on. As far as can be ascertained no change has been made in the rule that reasonableness is the test of the validity of an order of a district.

We must now examine some later statutes bearing on this general subject.

In 1929 the legislature enacted chapter 174 of the Laws of 1929, which amended chapter 215 of the Laws of 1905, not, however, in any respect in which we are interested.

In 1913, however, an act was passed which had some bearing on chapter 215. That year chapter 259 of the Laws of 1913 was enacted. The first section of that chapter provided as follows:

"That from and after the taking effect of this act it shall be unlawful for any person, partnership or corporation to take from within or beneath the bed of any navigable river or any other river which is the property of the state of Kansas any sand, oil, gas, gravel or mineral, or any natural product whatsoever from any lands lying in the bed of any such river or any hay, timber or other products belonging to the state, except in accordance with this act."

The act then provided for the executive council of the state making rules and regulations and laying down terms upon which sand could be taken. The executive council did make many rules and set a price to be paid for sand. For many years sand companies operated under this statute and the rules and terms determined by the council. This statute was upheld in several decisions. (See *Wear v. Kansas*, 245 U. S. 154, 62 L. Ed. 214, 38 S. Ct. R. 55.) The statute is of interest to us here on account of some arguments made by defendants which will be noted later on in this opinion and also because it evinces a determination on the part of the legislature that the sweeping grant of power to drainage districts was subject to curtailment by the subsequent enactment of legislation.

· The above construction is borne out by the enactment of chapter 173 of the Laws of 1917. That chapter provided, among other things, that—

"All drainage districts incorporated under the provisions of chapter 215 of the Session Laws of 1905, shall have power: First, to take from any navigable river within their corporate limits, sand, gravel, rock, or other minerals, with-out the payment to the state of any compensation therefor. . . ."

Clearly chapter 259 of the Laws of 1913 had been interpreted to mean that a drainage district had to pay for sand taken from a navigable stream even though it was taken from that part of the stream that was within the borders of the district. This statute was construed by this court in *State, ex rel., v. Kaw Valley Drainage District,* 126 Kan. 43, 267 Pac. 31. In that case it was held that the act did not confer on drainage districts the authority to engage in the business of operating a sand plant for profit even though the sand was taken from a stream from within the borders of the district. In the opinion this court also said, with reference to a drainage district:

"A drainage district so created is a quasi municipal corporation, an arm of the state, created by the legislature to perform a function of government, namely, to provide a drainage system for the district."

The matter of flood control and irrigation as co-related subjects began to engage the attention of the legislature in a constructive way in 1917. That year the Kansas water commission was created by chapter 172 of the Laws of 1917. The first section of that chapter provided as follows:

"A commission which shall be known as the Kansas Water Commission is hereby created for the purpose of investigating and controlling the problems of flood prevention, drainage, domestic water supply, water power, navigation and irrigation in the state of Kansas. But said commission shall not interfere with any drainage system now established in drainage districts created under existing laws."

The act further provided for the commission making a general plan for each watershed in the state and provided further that the commission should study the laws of the state relating to drainage and kindred subjects and make recommendations to the legislature from time to time. As this act was written it did not make much change in existing laws.

· In 1919 chapter 218 of the Laws for that year created the division of irrigation within the state board of agriculture. It was made the duty of the commissioner appointed pursuant to the act to gather

data concerning irrigation in the state. There had been a provision for a board of irrigation, but these provisions were repealed by chapter 218 of the Laws of 1919. Some state funds were made available for the carrying on of this work. So far these laws do not appear to have had much to do with our problem, but the study of the problem of flood control on one hand and of irrigation on the other was going on all the time.

In 1927 chapter 293 of the Laws for that year was enacted. The first section provided for the consolidation of the Kansas water commission with the division of irrigation and created the division of water resources within the state board of agriculture. The second section conferred all the powers of both the above boards upon the division of water resources. The water commission and the division of irrigation were abolished. The acts providing for the creation of both these bodies were repealed. This is of interest to us here because it will be remembered that section 74-2601 of R. S. 1923, being section 1, chapter 172 of the Laws of 1917, had created the water commission and had provided that it should not interfere with any drainage system then established in drainage districts created under existing laws. Chapter 293 of the Laws of 1927 repealed this section. The chapter did not, however, confer any new power on the division of water resources.

The session of 1929 seems to have been a fruitful one as far as drainage and flood control are concerned. The first act we shall notice is chapter 176 of the Laws of 1929. That was a comprehensive and ambitious plan for the organization of drainage districts in more than one county. On account of the fact that the sections providing for the organization of districts provided for district judges acting outside their districts and beyond their judicial powers, the act was declared unconstitutional in *Verdigris Conservancy District v. Objectors*, 131 Kan. 214, 289 Pac. 966. The act, however, had a provision that if any section or sections were declared unconstitutional the remainder of the act should not be invalidated but should remain in full force and effect. The act then contained the following section:

"From and after the taking effect of this act it shall be unlawful for any person, corporation, drainage or levee district, operating under any of the drainage or levee laws of the state of Kansas, without first obtaining the approval of plans for the same by the chief engineer of the division of water resources, to construct, cause to be constructed, maintain or cause to be maintained, any levee or other such improvement on, along or near any stream of this state

which is subject to floods, freshets or overflows, so as to control, regulate or otherwise change the floodwaters of such stream; and any person, corporation or district violating this section of this act shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than one hundred dollars nor more than one thousand dollars, or by imprisonment in the county jail for a period of not more than one year, or by both such fine and imprisonment, and each day any structure is maintained or caused to be maintained shall constitute a separate offense. And in the event any such structure is about to be constructed, is constructed, or maintained by any person or corporation without approval of plans by the chief engineer, it shall be the duty of the attorney general, on the request of the chief engineer, to file suit in a court of competent jurisdiction, to enjoin the construction or maintenance of such structure: *Provided,* That prior to the adoption of a general plan of drainage and flood protection, as provided in section 12 of this act, or in section 24-901, Revised Statutes of Kansas, 1923, and the commencement of construction in carrying such plan into effect, the chief engineer of the division of water resources may give temporary approval for the repair and maintenance of any levee or other drainage work in existence on the passage of this act; but such approval for such temporary repair and maintenance shall be without prejudice to a withdrawal of such approval when a general plan shall be adopted: *Provided,* That nothing contained in this section shall apply to any drainage district heretofore organized under chapter 215 of the Session Laws of 1905 and having therein property of an assessed valuation of fifty million dollars or more." (§ 71.)

It should be noted that this section required any drainage district before constructing or maintaining any levee to have its plans approved by the chief engineer of the division of water resources. Attention has already been called to the repeal of section 1 of chapter 172 of the Laws of 1917, which section had provided that the Kansas water commission should not interfere with drainage districts already organized. Attention is now called to the last provision of section 71 of chapter 176 of the Laws of 1929. It was provided there that the provisions of section 71 should not apply to any drainage districts organized under the act of 1905 having property therein of an assessed valuation of fifty million dollars or more. Since the Kaw Valley district was the only one with such a valuation, this proviso is another indication of the determination of the legislature to bring drainage districts in general under the supervision of the division of water resources and its chief engineer.

But chapter 176 was not the only act with reference to drainage that was passed in 1929.

The next act we shall consider is chapter 203 of the Laws of 1929. The first section of that chapter provided as follows:

"From and after the passage of this act, it shall be unlawful for any person

or persons, partnership, association, corporation, county, city, town, or township to construct any dam or other water obstruction; or to make. or construct, or permit to be made or constructed, any change therein or addition thereto; or to make, or permit to be made, any change in or addition to any existing water obstruction; or in any manner to change or diminish the course, current, or cross section of any stream within this state without the consent or permit of the chief engineer of the division of water resources, in writing, previously obtained, upon written application to said chief engineer therefor: *Provided,* That jetties or revetments placed for the purpose of stabilizing a caving bank shall not be construed as obstructions to this act providing such jetties and revetments are properly placed."

The succeeding sections provided for plans and maps being furnished and approved by the chief engineer and provided a penalty for the violation of the act. These sections are G. S. 1935, 82a-301 to 82a-305, inclusive. The permit to the sand company, with which we are concerned here, was issued pursuant to these chapters. It should be noted that the first section provided for a hearing before the permit was granted: The plaintiffs in this case argue that this section referred only to such structures as dams in a river and not to sand dumps such as we are considering here. This is too narrow a construction. We shall read the section, as follows:

"It shall be unlawful for any person . . . to construct any . . . water obstruction; or in any manner to change . . . the course, current or cross section of any stream . . . without the permit of the chief engineer of the division of water resources."

So considered, the section clearly applies to sand dumps. The dump might be an obstruction and it certainly might change the cross section of the stream.

The legislature of 1929 also passed chapter 143, Laws 1929. The first section of that chapter provided, in part, as follows:

"The division of water resources in the state board of agriculture, under the supervision of the chief engineer, is hereby authorized and directed to make a survey of the streams of the state of Kansas, for the purpose of establishing bank lines on said streams. . . ."

The term "established bank line" is used a great deal in the pleadings, evidence and findings in this case. It should be noted that the provision quoted above from chapter 143 is the first use of the term in our statutes and then it is used in connection with conferring authority on the division of water resources and its chief engineer. The second section authorized the board of county commissioners to clean and maintain the banks and channels of streams within the bank lines established by the division of water resources

for the purpose of reducing floods and overflows. The third section provided for the expenses being paid out of the general fund of the county. Section 4 provided that one-half the net proceeds of the sale of products taken from the bed of any river, which was the property of the state, should be returned to the counties through which the river flowed, and the fund should be used for cleaning or maintaining the stream. The section also contained the following proviso:

"That where such river extends into or through any drainage district in this state, organized under any of the drainage district laws thereof, the board of directors of such district shall be entitled to receive the same portion of the proceeds of such products as is provided in section 71-102, Revised Statutes of Kansas, 1923."

R. S. 1923, 71-102, provided that drainage districts should receive one-third of the net proceeds of sand taken from that part of a stream that lay within the limits of any drainage district. It was clearly the intent of this act that bank lines should be established along streams regardless of whether drainage districts had been organized. This chapter also repealed the provisions of the statutes which had conferred on county commissioners jurisdiction over the work of cleaning streams.

A flaw in chapter 143, Laws 1929, soon developed. While the first section directed the division of water resources to make a survey of the streams of the state and to establish bank lines, no funds had been made available for that purpose.

Accordingly the legislature of 1931 enacted chapter 318, Laws 1931. Section 1 of that act amended section 2 of chapter 143 of the Laws of 1929 by providing that upon petition of fifty taxpayers of any county owning land in the flood plain of any river in the county, the county commissioners were authorized to clean and maintain the banks of streams within definitely established lines.

The act then provided that before doing the work provided for in section 1 the county commissioners should cause a survey to be made showing the bank lines to which the streams were to be cleaned and maintained and—

"Shall submit to the division of water resources, state board of agriculture, a map showing the bank lines so established to which it is proposed to clean and maintain the stream and showing obstructions which it is proposed to remove. Such plan shall have had the approval of the chief engineer of the division of water resources before the board is authorized to proceed with the work."

Section 3 provided that expenses incurred be paid from the general revenue fund of the counties. Section 4 provided that one-half of the net proceeds of the sale of sand taken from the river should be returned to such counties as had adopted the act, the money to be used for the cleaning and maintenance of the stream. There was also the same provision that was in chapter 143 relative to drainage districts being paid one-third of the proceeds of sand or other minerals taken from any river where it extended into or through any drainage district. Section 5 of the chapter provided as follows:

"This act shall not apply to the portions of any stream lying wholly within the boundaries of any organized drainage or levee district: *Provided,* That that portion of such stream is actually improved and maintained by and as a part of the work of such district."

It will be seen that the results of the enactment of this act was that the work of doing the surveying attendant on establishing the bank lines should be done under the supervision of the county commissioners, but that before it was done the plan in each county should be approved by the chief engineer of the division of water resources. The two statutes are of interest to us here because they show that established bank lines were provided for therein and were the result of the work and plans of county commissioners and the division of water resources. They show too clearly to admit of argument the legislature intended the matter of flood control should be considered to apply to as much of the river as flows through the state. Search of the records of the division of water resources discloses the operative interpretation of the act has been that the bank lines should be established along the whole length of the river in each county that comes under the act regardless of whether there were drainage districts along the river. The act has been followed through Sedgwick, Cowley and Sumner counties, which cover all the river from where the drainage district in this case is located to the point where it leaves the state.

The operative interpretation which has been put upon section 71 of chapter 176 of the Laws of 1929 has been that all plans for the building and maintenance of levees by drainage districts should be submitted to the chief engineer of the division of water resources.

We have examined the legislation on these matters at some length on account of the argument of the defendant sand company that the action of the chief engineer of the division of water resources was final in a case of this kind, on the one hand, and the argument of

plaintiffs, on the other hand, that the act of the drainage board in ordering the sand dump taken out was final. The latter argument is to the effect that the taking of sand from the river bed is still carried on subject only to the orders and regulations of the executive council and that the order of the drainage district was a legislative act subject to no review whatever. Neither of the arguments is entirely correct.

The enactment of the laws we have just reviewed had the effect of depriving the drainage district of many of its powers. It no longer enjoys the supremacy in the conduct of affairs within its boundaries that it once had. The legislature has taken effective steps to bring the general subject of flood control under a common head so that a comprehensive plan may be evolved for the entire length of a stream within the state. The plans of any drainage district must yield to the general plan when the two conflict. On the other hand, the division of water resources is an administrative body. Its orders must be reasonable.

If the allegations of the petition that this sand dump caused the normal current of the river against the south bank to be augmented and caused the water to cut behind the established bank line, and if permitted to be maintained would force a channel whereby the levee would be rendered useless as a protection to property were proven in this action, or if there was substantial evidence to support such an allegation, then the order of the chief engineer permitting the maintenance of the sand dump was unreasonable. Obviously there is no benefit to the drainage of the entire river to have the sand dump maintained; so, if it was causing the river to cut into the south bank so as to endanger the levee it should not be maintained. The chief engineer of the division of water resources evidently had this same idea because in his order permitting the maintenance of the sand dump he inserted the following:

"The normal current of the stream shall be directed against the sand dump at all times and shall not be permitted to cut the natural banks on either side of the river back of the established bank lines. No permanent obstructions shall be placed in the stream which project above normal low water within the established bank lines."

There can be no question but that the current of the river has been directed against the south bank and has cut behind the established bank lines. The question that confronts us is—Was there substantial evidence that the maintenance of the sand dump caused this?

The first witness for the plaintiffs, a member of the board of directors of the district, testified as to the size of the sand pile about which there does not seem to be much dispute, but offered no testimony on the precise question we are considering.

The next witness was an engineer for the district. He testified about having seen the south bank cave into the water. He was asked whether the normal current of the river was directed against the sand dump, and answered in the negative. He was then asked the following question: Does the sand dump as allowed by this permit change the course, current and cross section of the stream at the point in question? After some objection by counsel he was permitted to answer that question in the affirmative. The defendants objected to the admission of this evidence on the ground that the witness had not shown himself to be qualified professionally. His qualifications were not as good as those of some of the engineers who testified later for defendants, but we have concluded that he was well enough qualified so that his testimony was competent and his lack of technical qualifications goes rather to the weight of his testimony than its competency. Later on this witness was permitted to testify that at the point in question the river was flowing about fifty feet south of the established bank line. That this was the case is admitted by all parties.

The next witness was the president of the board of directors of the drainage district. He testified as follows:

"I have noticed a change in the river bank at the levee opposite the Dolese plant within the past year. The stream did flow against the north bank and now it is flowing against the south bank right along where they pump the sand out and it is caving. Since the sand dump has been put in, the south bank has been washed away and pumped away until it is right close to the dyke now. . . . The bank is within 30 to 50 feet of the dyke all along there now. Years ago or a year or so ago it was a couple of hundred feet from the dyke. . . . Prior to the time that Dolese Brothers put their sand pump in there the water flowed toward the north bank, but they have been forcing it south ever since they have been there. I do not know when they put the pump in the river."

The next witness was another member of the board of directors. He testified:

"Before the sand was placed in the river by Dolese Brothers the channel was to the north. Now it is to the south side. I have observed the bank of the river opposite the sand plant cave in."

The next witness was another member of the board. He testified:

"Before the sand was placed in the river the course of the stream was to the north side. After the sand was placed in the river the course was to the south side."

The next witness, who had observed the river, was a resident of Wichita. He testified as follows:

"Before placing the sand the channel was immediately against the north bank. After placing the sand there it is at the south bank."

This concluded the testimony offered by the plaintiffs.

After the plaintiffs had rested, the defendants demurred to the evidence on the ground that it did not prove any cause of action against them. This demurrer was overruled.

It will be noted that the question of fact, as heretofore set out in this opinion, was not whether the current was against the south bank of the river, but whether this sand dump caused it to be against the south bank of the river. About the only testimony offered by the plaintiffs on that question was that of the engineer heretofore quoted. The other witnesses, whose testimony has been quoted, did not touch on the precise question of fact with which we are now concerned. After the demurrer of the defendants to the evidence was overruled the defendants went ahead and introduced their evidence. This consisted of the testimony of the chief engineer and the assistant chief engineer of the division of water resources and some employees of the sand company. They testified from various maps and the studies of the river that have been made from time to time. Their testimony was fair and unbiased and gave the court a comprehensive picture of about everything that has been learned about the river since the state began to take an interest in the question of flood prevention and drainage. Their evidence was so fair that it supplied some of the elements that were needed to prove the plaintiff's cause of action. In a case of that kind where we are considering the question of whether or not there was substantial evidence to sustain the findings made by the trial court, which is really the question to be determined when we are considering the correctness of an order overruling the demurrer to the evidence, we will consider evidence introduced by defendant as well as that introduced by plaintiff.

(See *Gould v. Hutchinson Oil & Gas Co.*, 150 Kan. 516, 95 P. 2d 301.)

Accordingly we shall now examine the evidence offered by the defendants bearing on our question.

The first witness to testify for defendants was an engineer who came to Wichita to assist in designing a flood-control system for Wichita on the big and little Arkansas rivers. He had been an engineer for the plaintiff in 1928 and 1929. He had worked with the river in one capacity or another for many years. He had prepared one of the maps that plaintiffs had used in presenting their case.

The position of defendants was that the deflection of the current that caused the cutting behind the established bank line was caused not by the sand pile, but by an island that had been in the river just south of the sand pile. On this point he testified as follows:

"At·the south end of contour 83 of the sand pile, as shown on plaintiffs' exhibit 1, there was an island or sort of a clay point. The extent of that island at the time I made the survey was approximately 175 feet or 200 feet in length and about 30 or 40 feet in width. The island consisted of natural soil deposit similar to the natural banks of the stream. In other words, it was not sand, it was clay or loamy formation. At the time I made plaintiff's exhibit 11 the south bank of the river had encroached upon or gone south of the south established bank line. It had so gone south of the established bank line immediately opposite this island referred to. I have an opinion as to what caused the actual bank to extend south of the established bank line. It was caused by the position of the island, that is, its longitudinal axis lies from the northwest to a southeast direction, oblique to the center line of the flow of the river. The water flowing in the river coming from the curve lying immediately west of the Dolese plant would have its greatest velocity upon the north bank opposite of the curve or the cutting edge of the curve and then would go down and would be deflected by the island to the south and cut in that point, cutting the bank."

It will be noted that none of the witnesses for plaintiff had testified as to an island. This was the first witness who testified as to the fact that an island was there. It should be noted, too, that the witness testified that the island was covered with grass and had a top soil of clay or loam. This is important because of the argument of defendants that the sand in the dump was loose, fine sand, that if kept free from weeds and grass would wash away easily, while the clay and loam of the banks or the island would not scour so readily. It should be noted that this witness testified as a fact that the island was there and there is no dispute about that. He testified that it was his opinion that the current striking this island caused it to be deflected to the south bank. This was the question the trial court had to decide. It was the duty of the trial court to take this statement and weigh it along with other statements and

all the surrounding facts and circumstances. This witness also made the following statement:

"At the present time the flow of the current of the river is directed against the sand pile at the upper end and then flows parallel to it for the balance of its length."

This statement is in direct conflict with the statement of the engineer who testified for the plaintiffs. It was the duty of the trial court to decide which of these statements was the correct one. This witness then testified that the island had been removed. After making the statement in various ways that the pumping out of this island by the sand company caused the current of the river to flow parallel to the south bank rather than cutting into it, this witness then testified, as follows:

"The Court: Did the water flow north of that island? A. Some flowed north at that time, yes.

"The Court: And that part where the water flowed north at that time is now filled up with sand? A. Not now, it was as of this date. At the present time this island is entirely removed and there is an open flowing channel 250 to 300 feet."

This bit of evidence is persuasive to this court. Of course, the water did not flow to the north of this island after the island was pumped out. It is a reasonable inference, however, that the channel between the north side of this island and the north bank of the river was filled up with sand from the dump. Should this have been the case, there would have been a good reason why the current was shifted to the south. As long as there was a channel to the north of this island it is reasonable to infer that the river would flow, part of it at least, along that channel. Considerable weight is given this argument by the fact that on some of the maps there is some open water shown between the north side of this island and the north bank or edge of the sand dump. It is true that this witness testified that the open water between the south established bank line and the south edge of the sand pile had increased from 100 to 125 feet to about 250 to 300 feet between the time when he had made the map and when he had observed the river just before testifying, and that part of this was due to the island being pumped out, and part to the dump being washed away. There was testimony in the case, however, that differs from this and it was the duty of the trial court to reach a conclusion as to the question of fact from all the evidence. All inferences favorable to the trial court's findings must be drawn.

The next witness was the manager of the sand company. He testified as to the manner in which the sand company operated, about which there was no dispute; that between eight and ten percent of the sand was put back and it was fine blow sand. He also testified as follows:

"We started pumping out the island immediately after October 7, 1937, and sometime during that month we had it completely pumped out. I noticed a change in the flow of the river after pumping out the island in that the stream straightened up. The island wasn't really an island to start with, it was simply the south bank of the river or a portion of the south bank, and then when the WPA force went down there to make some excavating to build the dyke or increase the dyke on the south bank of the river they cut a channel through there and the water immediately went around to the south side of the island. Before the island was pumped out the flow of the stream was against the south bank of the river; that is, all of the water went around south of the island. When the island was removed the flow of the stream was straightened."

He testified further: "Immediately after the rise in water there was between 285 and 315 feet of open bed of the river."

He also testified: "There is about 200 to 250 feet of open flow of water south of the sand plant."

The assistant engineer for the division of water resources was the next witness. His testimony was largely to the effect that all parties were given a complete hearing at the time the permit was granted.

The next witness was an employee of the sand company. He testified that a seven-foot rise of water in June, 1938, washed away 100 to 120 feet of the sand dump.

The next witness was the chief engineer of the division of water resources. He testified, in part, as follows:

"We have a definite plan with respect to flood control of the Arkansas river through the city of Wichita past and as far as the John Mack bridge in connection with carrying out our duties under the water commission act of 1917 . . . The plan involved the widening and deepening of the channel through the city and the raising of the banks or the establishment of levee grades through the city and down to the John Mack bridge and beyond. . . . The effect of the lowering of the bed of the river is to increase the carrying capacity of the stream and permit floods to flow through the city at lower elevations than they otherwise would."

He further testified:

"Q. Now, what happens to that sand when it is placed in the river? A. It remains there until there is a sufficient flow of water to begin to reduce it, after which a portion of it usually drops into the holes pumped out by the

sand company and a portion floods along in suspension in the water or travels along on the bed of the river in what is known as the bed load.

"Q. Have you had experience, Mr. Knapp, with the placing of these what you would call waste sand, sand dumps from sand plants in rivers? A. Yes, these have been referred to as waste sand or, I think, in the trade commonly referred to as reject sand.

"Q. Have you had experience with that over a period of years with sand companies? · A. Yes, sir; ever since the act of 1929 was passed.

"Q. Does that extend over in the Arkansas river? To sand piles in the Arkansas river? A. Throughout the Arkansas river and in other streams.

"Q. What has been your experience with reference to them and their clogging or obstructing a stream insofar as the natural flow or the flow of the stream is concerned? A. Well, they may be measured as what appears to be a physical obstruction or as occupying a portion of the river channel during dry times, they are not an obstruction to the flow of water in the stream.

"Q: How do you arrive at that conclusion, Mr. Knapp? A. I arrive at that conclusion by studying such things throughout the state of Kansas.

"Q. Give us some of your experiences in connection with it. A. Well, there are various experiences. Perhaps as definite as any is the situation in the city of Topeka. At the time that act was passed in 1929 there were several very large sand piles in the Kansas river between the Kansas avenue bridge and the Rock Island bridge and soon after the act was passed I was petitioned to prohibit the return of any reject sand into the river. I made an investigation which convinced me that it could safely be returned subject to certain restrictions and put these restrictions into effect. Since that time the sand moved out every time a rise occurred on the river and the sand boats have since moved out of that section and there is not a single vestige of any of that reject sand in the river channel at this time."

This witness then described the sand pile, and further testified as follows:

"Q. Mr. Knapp, how does the river flow immediately to the west of the Dolese Brothers Sand Company plant? In what direction does it flow? A. From a point somewhat westward of the Dolese Brothers Sand Plant the water is accustomed to flow against the south side of the bank.

"Q. Why is that? A. Because of the curvature of the stream at that point.

"Q. Now, what is the direction of the stream with respect to the sand pile or sand waste? A. As the stream leaves the south part, the end of that curve, it tends to cross over and strike against the edge of the sand pile.

"Q. That is caused by the natural curvature of the river? A. Yes, sir.

"Q. Is the flow of the stream directed against the south bank of the river opposite the sand plant? . . . A. Not to any extent until a point approximately below the sand pile or approximately in the location of·the sand boat is reached.

"Q. Mr. Knapp, in your opinion, does the sand bar as it now exists obstruct the flow of the water in the Arkansas river? A. No, it doesn't.

"Q. Does it deflect the flow of the water in the river toward or into the south bank of the river immediately opposite the sand pile? A. It deflects the current of water downstream, after which it flows approximately parallel to the south bank.

"Q. Approximately parallel to the south bank. How much open flow or bed of the river is normally necessary to carry or is necessary to carry the normal flow of the Arkansas river, could you estimate that? A. . . . let's say from fifty cubic feet per second up to about twenty thousand, and we have all the conditions of flow below that. I think if you were to ask me that question with regard to low-water flow I could answer it."

This witness also testified at length about how pumping the sand out of the bed of the river made it deeper and this drew the water to the deep part. On this subject he testified as follows:

"By Mr. Spradling: Q. Suppose that the sand had been pumped out of the river and all of the reject sand placed completely over on the bank and not in the river—

"The Court: Up at Valley Center, for instance.

"Q. Yes, taken to Valley Center and not put in the river, would the river flow the same now with the sand in the river as it would if that reject sand had not been placed in the river? A. I would be unable to say definitely. Of course, it would depend on where the river is pumped out the deepest, probably not, for the reason the curvature, as you will note, is on the outside, on the north side, and if the bed of the stream was smooth there is a probability that the low-water flow would continue to flow to the north, whereas with the sand there the low-water flow has followed the location of the sand boat.

"Q. Has the sand dump in any way caused or is it causing cutting of the south river bank as it now exists? A. I could not reach that conclusion from my examination yesterday or day before yesterday."

On this evidence the trial court made findings of fact, among them being the one already noted—that the stream had cut behind the south established bank line and that this was caused in part by the current being deflected by the sand pile. We are not confronted with the duty of making a finding as to this fact. We have only the duty of deciding whether there was substantial evidence upon which the trial court could make the finding. All reasonable inferences must be drawn from the proven facts and circumstances in favor of this finding. When that is done we reach the conclusion that it is sustained by the evidence.

Ordinarily this conclusion would dispose of this appeal, because if the sand dump is causing the current to cut into the south bank and endangering the levee, it should not be permitted in the river.

The first conclusion of law made by the trial court was that the sand pile created a nuisance and an obstruction to the flow of the

river and changed the cross current of the river. This conclusion evidently is based on the provisions of subparagraph 9 of section 7 of chapter 215 of the Laws of 1905. This section is the one that gives the drainage district authority to declare certain obstructions to be nuisances. We have seen that many of the powers conferred on drainage districts by this chapter were taken away by subsequent enactments when general supervision over the flow of drainage districts was conferred on the division of water resources. Neither the evidence nor the findings of the court sustain a conclusion that this sand dump is a nuisance in itself. It is only the manner in which it is maintained that makes it unlawful. There is no evidence whatever in this record that the levee is endangered.

The next question has to do with the second conclusion of law. We have seen that if this should be taken literally it would read as follows:

"The State of Kansas, *ex rel.* Eli Eubanks, Couny Attorney, and the Riverside Drainage District of Sedgwick County, Kansas, are entitled to an injunction enjoining the defendant, Dolese Brothers, from maintaining said sand dump pursuant to the terms of the permit granted by the chief engineer of the Division of Water Resources of the state of Kansas;"

And,

"Defendant Dolese Brothers Company be enjoined from deflecting the channel in any manner to cause the cutting of the natural banks back of the established bank lines, and to pay the costs of this action."

The confusion is caused by the fact that on a motion to modify the findings and conclusions the trial court struck out part of conclusion No. 2 and substituted the latter part of the above. No final journal entry was ever made, so it leaves us all a little uncertain as to whether the trial court intended to enjoin the sand company from maintaining the sand dump pursuant to the terms of the permit or only to enjoin it from deflecting the channel so as to cut behind the established banks, or both. It would seem that if the trial court intended the latter it would be a contradiction in terms because if the dump had been maintained pursuant to the terms of the permit, then there would have been no need for the latter part of the order. On the other hand, had the court intended to enjoin the sand company from maintaining the sand dump under any circumstances it would not have ordered the sand company to be enjoined from deflecting the current. We are aided somewhat in deciding this question by our conclusion that all the relief the

plaintiffs are entitled to is that the sand company be enjoined from deflecting the current of the channel in any manner to cause the cutting of the natural banks back of the established bank lines. The permit issued by the division of the water resources placed that limitation on the sand company and it does not appear but what the sand dump could be maintained within such limitations. This controversy started in the fall of 1937 and the sand dump has been there all this time. Unlike some of our litigants, the Arkansas river has kept serenely on its way to the sea regardless of the lawsuits constantly being waged over the title to its bed, or the amount of water brought down from the mountains, sometimes too much, sometimes too little, or in this case the direction of its current. It is not recorded that Coronado started a lawsuit when he discovered the river 400 years ago, but the supposition is that had there been a court available he would have. Mayhap the three years that have elapsed since the events transpired that have been testified about in this case have demonstrated that the sand dump can be maintained without changing the current of the stream so as to cut behind its banks. In order to clarify this situation, therefore, we have concluded that the facts found do not justify a judgment that defendants should be enjoined from maintaining a sand dump pursuant to the permit, but they do justify a judgment that the sand company be enjoined from deflecting the channel in any manner to cause the cutting back of the established bank lines.

The questions raised by the drainage district in its cross-appeal have been heretofore dealt with in this opinion.

The judgment of the trial court as to the appeal is modified so that the defendant sand company will be enjoined from deflecting the channel in any manner to cause the cutting of the natural banks back of the established bank lines, and as so modified is affirmed. As to the cross-appeal, the judgment is affirmed.